KEMART CORPORATION, a Corporation, Appellant,

v.

PRINTING ARTS RESEARCH LABORATORIES, INC., a Corporation, Appellee.

No. 15638.

United States Court of Appeals Ninth Circuit.

June 17, 1959.

Carl Hoppe, Henry Gifford Hardy, San Francisco, Cal., for appellant.

Lyon & Lyon, Leonard S. Lyon, Leonard S. Lyon, Jr., Roland N. Smoot, Los Angeles, Cal., Julien F. Goux, Santa Barbara, Cal., for appellee.

Before STEPHENS, Circuit Judge, and HEALY and BONE, Senior Judges.

BONE, Senior Judge.

## PART I

This long-drawn-out litigation [1] was launched by the filing of an action in the lower court on November 23, 1948, by Kemart Corporation, a California corporation (hereafter referred to as appellant

or Kemart). Its action was in form a petition in which it prayed (1) for a declaratory judgment or decree declaring that it had the right to continue to manufacture, use, sell and license a (so-called) "Kemart Process" (which "process" it controlled under a license from the original patentees thereof whose (two) patents had been granted in 1946) without any threats of infringement or any interference whatever by or from appellee Printing Arts Research Laboratories, Inc., a Delaware corporation (hereafter referred to as appellee or Printing Arts), or its successors; (2) a declaratory judgment adjudging that *both* of the Printing Arts patents [2] are invalid and void at law, and that neither of them nor any claim thereof, has been infringed by the "Kemart Process" or any of the devices, materials, equipment or supplies used to practice the "Kemart Process" which are now or were heretofore made, sold or licensed, and offered for license or sale by Kemart; (3) for judgment for Kemart's *attorney fees and costs*; (4) for a preliminary restraining order and permanent injunction enjoining Printing Arts, its attorneys, agents and those in active concert or participating with it, from in any way threatening suits for infringement against any of Kemart's licensees or potential licensees, and from in any way asserting that the Kemart Process is an infringement of the two Printing Arts patents in suit; (5) for *damages* resulting from Printing Arts "wrongful acts and doings" which are pleaded in Kemart's petition [3].

[1.] Kemart points out in its brief that this case is now before this court for the fourth time.

[2.] Printing Arts was then, and now is, the owner of two patents which had been issued to Walter S. Marx, Jr., in 1940 and later assigned to Printing Arts which corporation was the owner of these Marx patents during all times here pertinent. The only Printing Arts patent which was finally involved in this litigation is patent No. 2,191,939. Its other patent was dropped from this controversy.

[3.] As to the claimed "wrongful acts and doings" of Printing Arts, the petition of Kemart asserted, inter alia, that Printing Arts has circulated *letters and statements* that the Kemart Process is an infringement of either or both of Printing Arts Letters Patents; that *said letters and statements* were circulated for the express purpose of harassing Kemart and its licensees and destroying Kemart's business; that by reason of such acts and doings of Printing Arts, Kemart is having great difficulty in doing business with respect to its processes; that *some prospective licensees* have refused and

In its list of general charges brought against Printing Arts, the Kemart petition also sets forth, inter alia, a series of averments wherein it charges (1) that both Printing Arts patents are invalid and void because the patentee thereof was not the original and first inventor or discoverer of any material or substantial part of the things patented therein; that they are also void and invalid because they were anticipated by more than two years by seven prior inventions under (listed) United States and British patents, and were "surreptitiously or unjustly obtained" by Printing Arts, (2) that both Printing Arts patents were the invention of another and claimed more than Printing Arts was entitled to; that its patent No. 2,191,939 is substantially different from any invention indicated, suggested or described in the original application therefor.

The Kemart petition further averred that Kemart's process does not in any way infringe any of the Printing Arts patents or any claims thereof; that Kemart and its licensees have not done any act or thing, nor do they propose to do anything, in violation of the rights of Printing Arts under its said patents; that Printing Arts has (also) done the things and performed the (wrongful) acts (which we have noted in footnote 3 of this opinion).

In an answer and *counterclaim* to Kemart's petition, Printing Arts averred, inter alia, that it was the owner of all rights, title and interest under its two (so-called) "Marx patents" mentioned in the Kemart petition; that with respect to Marx patent No. 2,191,939,[2] admitted that it had charged Kemart with contributory infringement of this particular patent but *not* as to the other Marx patent; that it had never threatened to

sue any of Kemart's licensees for infringement of either of the two Marx patents, and that the second Marx patent (No. 2,304,838) should be stricken (as it later was) from the action.[2]

In a later and amended and supplemental counterclaim filed by Printing Arts, it averred, inter alia, that Kemart had been *directly infringing* ten out of the twelve claims of the "Marx patent" No. 2,191,939, and *contributorily infringing* this particular patent by selling or otherwise vending to infringers of this Marx patent Kemart equipment and supplies and instructions with the purpose and intent that such Kemart matter shall be used by the purchasers in practicing without right or license the method or process covered by Marx patent No. 2,-191,939. In this pleading Printing Arts demanded (1) a preliminary and final injunction against further *contributory infringement* by Kemart and those it controlled, and (2) an accounting for profits *and damages,* and an assessment of *costs* against Kemart.

Kemart filed an answer to this *amended and supplemental counterclaim* in which it admitted that Printing Arts owned patent No. 2,191,939; again averred (as it had in its petition) that Marx patent No. 2,191,939, here pertinent, was invalid and void and that this was true because the applicant named in its Letters Patent was not the original and first inventor of what was claimed in this Marx patent (citing eight claimed prior art United States and British patents), and that the said Letters Patent is also void and invalid because it does not disclose a patentable invention; that the material and substantial parts of the said Printing Arts patent were known and used by others in this country prior to the (Marx) alleged patent here noted,

---

continue to refuse to purchase and deal in Kemart's processes until *such charges* and claims are eliminated; that if a suit for infringement is filed by Printing Arts, Kemart's licensees will require Kemart to furnish an indemnity bond before continuing with licenses under the Kemart Process, thus causing Kemart

unnecessary and burdensome expense and thereby causing Kemart to stand in immediate and grave danger of irreparable loss and damage as a result of such unlawful acts of Printing Arts.

2. See Note 2 on Page 377.

and were patented and described in printed publications here and abroad *before* the said Marx patent, or more than two years before application for this Marx patent; that the constructions, devices, supplies and methods identical with those alleged (by Printing Arts) to be contributorily infringed, *and* the "Kemart Process", which is also claimed to infringe Marx Patent No. 2,191,939, were freely manufactured, used, sold and licensed in the United States by Kemart's predecessors long prior to said Printing Arts counterclaim, all of which was fully known to Printing Arts; that Printing Arts, as early as May 4, 1943, sent a "Notice of Infringement" of the said Marx patent to Kemart's predecessors because of such infringement, and threatening suit against them, and that such a suit was never filed by Printing Arts against Kemart and/or its said predecessors prior to Printing Arts' answer and counterclaim first filed in the instant action; that Kemart, because of this long delay and apparent acquiescence by Printing Arts and in reliance thereon, entered upon the present commercialization of the Kemart Process in which effort it incurred great expense and undertook fundamental obligations which it would not have incurred or undertaken had Printing Arts not acquiesced in such manufacture, use, sale, and licensing operation by Kemart, all of which estops Printing Arts from enforcing any rights against Kemart.

In this answer to Printing Arts' amended counterclaim, Kemart prayed that the Printing Arts' amended counterclaim be dismissed with prejudice and with *costs* and reasonable *attorney's fees*.

The written pleadings as outlined above were not further amended in any subsequent stage of this litigation. On the issues thus raised the case went to trial in the lower court and on January 31, 1951, that court adjudged that Kemart was guilty of infringing all of the claims of Printing Arts patent No. 2,191,-939 except 5 and 7 thereof. On appeal from this judgment this court found that the Kemart Process *did not* infringe the

said Printing Arts patent. We reversed the lower court with instructions to dismiss the counterclaim of Printing Arts. See our opinion in 201 F.2d 624 noted just below.

During the course of this litigation this Court has rendered two opinions. They are reported as Kemart Corporation v. Printing Arts Research Laboratories, Inc., 9 Cir., 1953, 201 F.2d 624, and Kemart Corporation v. Printing Arts Research Laboratories, Inc., 9 Cir., 1956, 232 F.2d 897, 57 A.L.R.2d 1234.

The lower court has rendered one opinion reported as Kemart Corporation v. Printing Arts Research Laboratories, Inc., 1956, 146 F.Supp. 21.

Since the two noted opinions of this Court set out in sufficient detail the particular (and isolated) issues of fact and law before this court at the times of their rendition, a repetition of our holdings therein would unduly burden this opinion. It is sufficient to say that these two opinions resulted in a disposition of only certain of the issues posed in Kemart's petition and left remaining for later adjudication by the lower court only two issues, to wit, appellant's claim for *damages* and for *attorney's fees*. In dealing with the merits of these terminal issues (upon which the parties agree) the lower court rendered its above noted opinion in 146 F.Supp. 21. The instant appeal is from the final judgment rendered by that court in disposing of these two issues.

The Findings and Conclusions entered by the trial court show that upon the evidence and testimony adduced in this final trial it was of the view that appellee Printing Arts reasonably and in good faith believed, upon advice given it by its own counsel, that its charge that Kemart had infringed its patent No. 2,-191,939 was true; that in making such a charge appellee was not prompted by malice but acted *solely* in defense of this patent and that such conduct was a complete defense to appellant Kemart's claim for *damages*.

The lower court made and entered (later noted) formal findings of fact,

conclusions of law and a judgment adversely disposing of Kemart's claims for damages and for an award of attorney's fees. It therein directed that each party should bear its own *costs* in that court.

### The Evidence

Because of conflicting claims of the parties as to whether the evidence and testimony shown in the record adequately sustains the court's finding of facts and conclusions of law, we endeavor to summarize the controlling and established facts as they must have appeared to the experienced district judge who had presided during all trial stages of this extensive litigation.

The trial record makes clear (and the court so found) that the parties since June, 1947, have been competitors in their respective businesses of granting licenses under their respective "processes."

The evidence and testimony shows that the first of the claimed (and later noted) "wrongful acts and doings" of appellee (relied upon by appellant) occurred at and during a national convention of the "American Photoengravers Association" held in Cleveland, Ohio, the opening day of this convention (hereafter "Convention") being October 7, 1948. Appellant frankly stated to the court below that "this thing all started with Mr. Marx"—if he "had not made his 'publication' in

Cleveland, it wouldn't have been necessary to bring the [appellant's] suit." Other of such claimed "acts and doings" occurred *after* the Convention and these matters were covered in great detail in the evidence and testimony at trial. While the specified and later noted "wrongful acts and doings" of appellee's officers and/or agents constitute the basis of appellant's charges against appellee, various men other than those directly associated with appellee and its business operations were also brought into the evidential picture. In the margin we have noted the names and particular business connections of these men.[4] Their activities were fully developed in the testimony. As note 4 indicates, two of these men happened to be connected with, and were active in "trade" operations connected with the business of distributing photoengraving supplies in this country. Another man was editor of the "Photoengravers Bulletin", a national magazine devoted to publication of matters of interest to those in the photoengraving business. Certain of the "publications" which are claimed to have damaged the business of appellant appeared in this "Bulletin". We later describe these "publications" for they underlie appellant's claim of damages.

Upon the above noted pleadings in this case, and from all of the evidence and testimony relating to the issue of dam-

---

4. Walter S. Marx, Jr., patentee on the particular Marx patent here involved, was present at the convention. He was the actual operating head of Printing Arts, the business of which is in Santa Barbara, California.

Albert G. McCaleb (now deceased) was then President and one of the Directors of *Printing Arts*; he was also (as its legal counsel) in charge of its corporate records, patent papers, legal correspondence, and the like. McCaleb maintained an office in Chicago, Illinois and was a prominent trial lawyer specializing in patent causes.

Frank Adams, an attorney, was then (and now is) President of Kemart.

William Pensinger was then Vice President of Printing Arts. (Pensinger and McCaleb represented Printing Arts at the convention.) Marx, who was the largest stockholder of this corporation, was also in charge of certain activities,

including scientific research and executive efforts on behalf of Printing Arts.

J. S. Mertle was then "technical advisor" of Kemart. He was also a columnist, writing articles concerning photoengraving problems.

Lewis Flader was then the executive secretary and an ex-Commissioner of Association. He was also the author of text books in the graphic arts field, and editor of the "Photoengravers Bulletin", a trade journal which was circulated to those engaged in the photoengraving industry.

H. B. Latimer and Paul Schmidt were both representatives of the Harold M. Pittman Company, which appellant asserts was the world's largest distributor of graphic arts supplies. It was a distributor of Kemart supplies furnished by Kemart, and supplies furnished by Printing Arts.

ages which was adduced at trial, the trial judge was justified in concluding that five different incidents, i.e., "wrongful acts and doings" of Printing Arts and/or its agents prior, during, and following the Convention (including certain of Kemart's actions claimed by Kemart to have been induced by the actions of Printing Arts) had been clearly established. We describe these five "incidents" in the order in which they occurred, and since at least two of them were referred to by counsel for Printing Arts in trial argument as "steps," we utilize that general term in describing them.

"Step" number one: McCaleb, under date of October 6, 1948, prepared a written opinion in letter form which he sent to appellee (who was also his client). In this letter McCaleb charged appellant and its "process" with infringing appellee's Marx patent No. 2,191,939, and he therein stated certain of his "conclusions," as follows:

"October 6, 1948
"Printing Arts Research
 Laboratories, Inc.
"San Marcos Building
"Santa Barbara, California
"Gentlemen:
"Re: Your Marx Patent No. 2,191,-
 939 dated February 27, 1940
 and its infringement by the
 Kemart process of making half-
 tone negatives.

"Pursuant to your recent request, I have reviewed your above identified patent, and the application therefor, and have familiarized myself with the above mentioned Kemart process, to determine whether or not such process infringes such patent.

"My conclusions, tersely stated, are as follows:

"(1) Anyone who practices the Kemart process infringes several claims of your patent aforesaid.

"(2) The Kemart Corporation, sponsor of the Kemart process, is contributorily infringing such pat-

ent when it furnishes infringers thereof with supplies, equipment and instructions facilitating their practice of such Kemart process.

"(3) Nothing in either the history of the application for your said patent or any prior art patent or publication which has come to my attention casts any doubt upon the validity of such patent or any of the claims thereof; I believe your said patent will be adjudged valid, and that its claims will be accorded substantial scopes, if it is subjected to the test of litigation.

"The Kemart process, in which is employed the so-called Kemart neutralizer (a material absorptive of ultra-violet light) is but a variation of the fluorographic process as disclosed in your subject patent—a variation of the fluorographic process which plainly falls within and is covered by a number of the patent claims. Even if the Kemart neutralizer were not absorptive of ultra-violet light, the Kemart process would still infringe your herein discussed patent, and more particularly claim 12 thereof; but since such neutralizer is in fact absorptive of ultra-violet light, infringement of several additional claims of the patent by the Kemart process is abundantly clear.

"I recommend that all users of the Kemart process, in so far as you are able to identify them, be notified of the existence of your aforesaid patent No. 2,191,939, its nature and coverage, and their infringement thereof.

"Yours very truly,
"/s/ Albert G. McCaleb,
"Albert G. McCaleb."

(This letter was placed in evidence as Exhibit RR.)

On October 7, 1948, and while present at the above noted Convention of Association, Walter S. Marx, Jr., exhibited the said McCaleb letter of October 6, 1948 (see footnote 4) to Frank Adams (President of appellant) and to J. S. Mertle,

H. B. Latimer, Louis Flader and Paul Schmidt. (Counsel for appellant assured the lower court that "this whole controversy started really on October 7, 1948, at which time Mr. Marx displayed a letter at the convention * * *.") This "display" was the *first* "publication" claimed by Kemart.

### Post Convention Steps

"Step" number two: After the Convention and under date of November 10, 1948, McCaleb wrote a letter which was sent directly to appellant in which letter he referred to the contents of the letter of October 6, 1948. In this letter of November 10, 1948, McCaleb quoted his earlier (pre-convention) letter of October 6, 1948 (which had been exhibited to Frank Adams at the Cleveland Convention) and then further stated in the letter of November 10, 1948:

"I have now been instructed to institute suit for infringement of the above identified patent against a representative user of the Kemart process, and intend so to do just as soon as certain prerequisite information can be obtained.

"If you defend such action, I shall suggest that your counsel and I stipulate as to the several steps of the Kemart process as practiced by the defendant and the nature of the devices and materials employed by the defendant in performing such process—so that the need for calling the defendant's officers and employees as witnesses may be minimized or eliminated.

"* * * Possibly you may want to have decided in the same case the related question of contributory infringement affecting you. If so, I shall be glad to cooperate with your counsel to that end."

"Step" number three: On November 23, 1948, appellant initiated the instant litigation by filing its petition in the lower court, all as noted at the outset of this opinion. On the same day appellant sent a letter to *all* of its licensees in which, inter alia, it generally advised them that appellant's said litigation had been instituted "for the purpose of protecting you and ourselves against a series of threats by the representatives and employees of Printing Arts which firm has expressed its opinion that the use of the Kemart Process in some way infringes the Marx patent." This letter also urged these licensees to continue use of the Kemart Process and to "feel secure that all proper steps are being taken."

In connection with step number three, Printing Arts had placed in evidence in the original trial its Exhibit NN which was also used as an exhibit in the present trial on the issue of damages. This was identified as "an excerpt from the Photoengravers Bulletin for December 1948." Concerning this exhibit, Frank Adams (President of Kemart) testified that *he* had "published" an advertisement in the said December 1948 issue of the Photoengravers Bulletin, and in connection with this advertisement had sent to this magazine a copy of appellant's said letter of November 23, 1948, addressed to its licensees and requested the said bulletin to publish this letter. This copy was published by the Bulletin in its December, 1948 issue in conformance with appellant's request. In this letter to its licensees, appellant stated, inter alia, that appellee's threats and statements were false and contrary to the proper spirit of competition in the photoengraving industry, and that in appellant's action filed on the date of this letter appellant was asking damages for appellee's "wrongful acts."

"Step" number four: Subsequent to the December, 1948 publication of appellant's above noted matter in the Bulletin, *appellee* forwarded to that magazine a "News Release" which "release" appeared in its May, 1949, issue. The material in this communication, as published, carried the heading "Kemart licensees liable to Lawsuit," and the further statement that the said "release" was also in explanation of appellee's "full page ad" in this (May 4, 1949) issue of the Bulletin. It also set forth therein, inter alia, that on March 28, 1949, the lower court had

issued a decision denying Kemart a temporary injunction restraining appellee from bringing a patent infringement suit pendente lite against users of the Kemart Process; that in appellee's pending suit against appellant it charges appellant with contributory infringement of Marx patent No. 2,191,939 by furnishing to appellant's licensees the materials wherewith to directly infringe the said Marx patent; that appellant has simulated appellee's process, and unlike appellant, the appellee prefers to try legal questions in the courts rather than in literary broadsides; that when it is legally advisable appellee will put any Kemart licensee on notice with respect to infringing appellee's patent, and a suit will very promptly be instituted against a Kemart licensee, but the pending action against Kemart will continue to be "vigorously prosecuted."

"Step" number five: In the June, 1950, issue of the Photoengravers Bulletin appellee again published, or caused to be published, an article which was characterized as a "news item". This article set forth that a new date had been set for trial of the action in which appellant Kemart is charged by appellee with infringing the Marx patent in suit. In this "item", Pensinger (Vice President of appellee), is quoted concerning the matters here mentioned. This matter was also publicized in "The National Lithographer", which appears to be a trade journal.[5]

Appellant introduced in evidence several letters it had received from its licensees during 1949, and they indicate that some of these licensees either canceled their license agreement with appellant or demanded that appellant take steps to protect them against infringement suits by appellee. A colloquy between court and counsel during the trial indicates that these letters were introduced only for the purpose of showing that appellant's claim of damage possessed substance. In this connection, the court suggested that evidence be first heard on the question of appellee's *liability* reserving any detailed evidence (accounting, etc.,) on the question of the amount of damages until a ruling was made on the legal question of *liability*. Counsel for appellant agreed with this suggestion and thereafter confined his questions to "generalities on the question of damages", this "to show that we will be entitled to them if we prevail on the main issues" (of liability).

Findings of Fact and Conclusions of Law

Against the foregoing background of evidentiary matter and from other evidence and testimony too lengthy and conflicting to here detail, the lower court made and entered formal Findings of Fact wherein, inter alia, it set forth that at all times between June of 1947 and the date of trial, appellee and appellant had been competitors with one another in their respective businesses of granting licenses under their respective patented "processes"; that prior to the commencement of appellant's action, appellee "reasonably believed" that its patent No. 2,-191,939 was valid and that it was infringed by appellant's process; that this *belief* was based upon the opinion of appellee's experienced, although interested, patent counsel and not upon "careless ascertainment" of appellee's patent rights; that prior to the commencement of appellant's action, appellee *showed* to appellant, in Ohio, a letter (Exhibit R.R. quoted supra), from appellee's patent counsel (Albert G. McCaleb), charging

---

5. A brief or passing reference to one other "publication" concerning the instant litigation appears in the testimony of Frank Adams. He there referred to a comment (which he claimed to have seen) which appeared during the summer of 1950, in the "Research Bulletin" of the "American Newspaper Publishers Association" (A.N.P.A.), wherein reference was made to a previous statement made by appel-lee concerning the instant litigation. This statement had appeared in the "Photoengravers Bulletin", and Adams said that (as he recalled it) the A.N.P.A. news item had advised its member newspapers that anybody taking the Kemart license would be sued by Printing Arts. (The court received the statement of Adams as "secondary evidence", subject to a motion of Printing Arts to strike.)

that appellant's "process" infringed appellee's patent No. 2,191,939, which charge was later determined to be false; that after seeing this particular letter, appellant itself published this charge of infringement in Ohio, and subsequently caused the charge to be published in a trade magazine of nation-wide circulation wherein the infringement was denied and appellee accused of wrongful conduct; that in response to appellant's publication in Ohio, appellee *there* published the charge of infringement and also published the charge in the aforesaid trade magazine in response to appellant's prior publication; that the publications by appellee were for the purpose and with the intent on the part of appellee to defend its own patent interests rather than to injure appellant's business.

The court further found as facts that appellee's publications were directed to the same interested persons to whom appellant's publications had been directed, namely, a consultant to persons in the photo-engraving field, possible infringers and contributory infringers, and the Executive Secretary of the photo-engraving trade association having an official interest in conflicts among members; that appellee's out-of-court publications of the charge of infringement, since determined to be false, were made *at a time* when appellee reasonably believed its said charge to be true, and that said publications were made in good faith and without malice, and were made to interested persons; that in pleading to appellant's complaint filed in this action, appellee alleged that appellant's process infringed appellee's patent; that such allegation was relevant and material to the cause of action and to the defense asserted by appellee; that a two-day delay on the part of one of appellee's officers in answering questions upon deposition was not due to bad faith and did not injure appellant.

The court further found that a misrepresentation by appellee's only witness at trial (Walter S. Marx, Jr.) as to his scientific background was a matter of no material consequence either in the prosecution or defense on the merits of this action; that appellee did not materially misrepresent the state of the prior art; that appellee did not determine the amount of the supersedeas bond or the form of the injunction restraining appellant following the trial, such determinations being made by the Court; that the instant case was not an exceptional case and appellee's conduct before, during and after the trial of the case evidenced no unfairness or bad faith; also, that such conduct was actuated by a reasonable belief, in good faith, that appellant's process was an infringement of appellee's patent; that neither the conduct of appellee nor any other equitable consideration makes it grossly unjust that the winner of this patent law suit be left to bear the burden of its own *counsel fees*, which prevailing litigants normally bear.

As Conclusions of Law, the court held that jurisdiction of the instant case was conferred by 28 U.S.C.A. § 1332; that conflict-of-laws rules of California are applicable; that under California law, a tort action is governed by the law of the place where the tort is committed; that legal principles constituting the law of libel or slander are the same, whether corporations or individuals are involved; that Ohio law provides that publication of a false charge of patent infringement is a tort in the nature of a trade libel or unfair competition, since such charge is likely to prevent others from engaging in business dealings with the alleged infringer, and that the injured party may recover its actual damages.[6]

6. Appellant urges in its brief that "these conclusions" as to *per se* liability noted in the court's order for Findings, Conclusion and Judgment, are soundly supported by Watson v. Trask, 1834, 6 Ohio 532; Union Central Life Insurance Co. v. Mutual Benefit Life Insurance Co., 1877, 5 Ohio Dec. Reprint 521, 523; Finney v. Smith, 1877, 31 Ohio St. 529, 532; Kahn v. Cincinnati Times Star, 1890, 10 Ohio Dec. 599, 620, affirmed without report 52 Ohio St. 662, 44 N.E. 1132; Cin-

The court further concluded that Ohio law recognizes, however, that a patentee may publish a charge of patent infringement to other interested persons, even though the charge later proves to be false, *if* the patentee reasonably and in good faith believes the charge of infringement to be true *and* was not prompted by malice but acted *solely* in defense of his patent; that such a publication is qualifiedly privileged, and appellee's good faith and absence of malice constitutes a complete defense to appellant's claim of *unfair competition* or *trade libel*.[7]

The court further concluded that *allegations in pleadings* which are relevant and material to the claim or cause of action or the defense asserted, are unqualifiedly privileged; that issues not raised by the pleadings, but tried by express or implied consent of the parties shall be treated in all respects as if they had been raised in the pleadings and appellee may *now* assert the defense of *privilege* even though not expressly pleaded; that the court, in exceptional patent cases may award reasonable attorney's fees to the prevailing party; that exceptional cases are those in which "unfairness or bad faith in the conduct of the losing party, or some other equitable consideration of similar force, * * * makes it grossly unjust that the winner of the particular lawsuit be left to bear the burden of his own counsel fees which prevailing litigants normally bear", Park-In-Theatres, Inc., v. Perkins, 9 Cir., 1951, 190 F.2d 137, 142; that attorney's fees should not be awarded herein.

In accordance with the Findings and Conclusions above stated, the court ordered, adjudged and decreed on December 19, 1956, (1) that it had jurisdiction over appellant's claim for damages for *unfair competition* or *trade libel;* that appellant take nothing by said claim and that this claim be dismissed; that appellant receive no award of attorney's fees, and that each party to this action bear its own costs in respect to proceedings subsequent to the last issued mandate of the Court of Appeals for the Ninth Circuit.

cinnati St. Ry. Co. v. Cincinnati Daily Tribune Co., 1894, 1 Ohio Dec. 281; and Henry Gehring Co. v. McCue, 1926, 23 Ohio App. 281, 154 N.E. 171.

7. During the final trial on the issues of damages and attorney's fees claimed by appellant, counsel for the parties engaged in a colloquy concerning the exact nature of the cause of action pleaded in appellant's petition as the basis of its claim for *damages*. Counsel for *appellee* argued to the court that appellant did not ground its cause of action on *libel;* that appellant's case is "a pure and simple case of *unfair competition*" despite the fact that appellant calls it a libel because he can't prove bad faith.

Appellant's counsel took issue with this contention, asserting that appellant had not stated a theory of *unfair competition* in its petition but had therein pleaded libel; that a false charge (of infringing appellee's patent) had been set out in the said petition; that the petition *may also* be an action for *unfair competition*, "but in Ohio they say this type of a charge is a libel and a slander—the Court of Appeals [in 232 F.2d 897, supra] indicated that appellant's action was a libel case— they said we are claiming damages for libel." (At the outset of this opinion we noted the specific charges appearing in appellant's petition. It therein charged that appellee had "circulated letters and statements" wherein it charged that appellant's process infringed appellee's two patents. At no point did the petition use the terms "libel" or "slander" in characterizing appellant's claims against appellee.)

When the court suggested that no *libel* had been pleaded, but that a claim of *unfair competition* had been made and then asked if *libel* was "a separate cause of action", counsel for appellant stated: "No, it's all mixed up in the same ball of wax." The court thereupon stated: "You may have two causes of action in one."

After the evidence on both sides was closed, appellant's counsel stated to the court in argument on the merits that he conceded that *if* the alleged false charge (of infringement) made by appellee is only actionable *as unfair competition* and is not actionable *as libel and slander*, then the existence of *bad faith* (on the part of appellee) in making such a charge "is a sine qua non to an *unfair competition* situation in this litigation." [Emphasis supplied.]

Appellant's motion of January 2, 1957, to amend findings of fact, conclusions of law, and for the entry of a new judgment, was denied on January 4, 1957.

On April 9, 1957, appellant moved the lower court to vacate and set aside its final judgment in this case. In this motion (based on Rule 60(b) Rules of Civil Proc., 28 U.S.C.A.) appellant argued (for the first time) that the "rule of decision" upon which the court's said final judgment is based, was overruled, limited or otherwise vacated in International Industries and Developments, Inc. v. Farbach Chemical Co., Inc., 1957, 6 Cir., 241 F.2d 246. Appellant further argued in its said motion that the alleged "rule of decision" relied on by appellee also contravenes the "Convention of the Union of Paris" of March 20, 1883, for the Protection of Industrial Property, as amended in London in 1934 (53 Stat. 1748, 1780), particularly Article 10 *bis* thereof which particularly forbids "false allegations in the conduct of trade of a nature to discredit the establishment, the goods, or services of a competitor."

On June 24, 1957, the lower court entered an order denying appellant's aforesaid motion to vacate. In this order the Court said that considering the motion as coming within said Rule 60(b) that under the law of Ohio as interpreted in the Farbach decision, supra, it must be held to accord a patentee the qualified privilege to publish a charge of patent infringement to other interested persons, even though the charge later proves to be false, *if* the patentee reasonably and in good faith believes the charge to be true, *and* the charge was not prompted by malice but was made solely in defense of his patent. In this order the lower court further held that the "Convention" cited by appellant, *does not, absent effectuation thereof by Congress*, eliminate the defense of privilege, good faith and absence of malice permitted by the law of Ohio. To this point the court cited: Vanity Fair Mills, Inc. v. T. Eaton Co., 2 Cir., 234 F.2d 633, 640, certiorari denied, 1956, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76; cf. Bacardi Corp. of Amer-

ica v. Domenech, 1940, 311 U.S. 150, 61 S.Ct. 219, 85 L.Ed. 98; Geofroy v. Riggs, 1890, 133 U.S. 258, 266, 10 S.Ct. 295, 33 L.Ed. 642; Head Money Cases, 1884, 112 U.S. 580, 598, 5 S.Ct. 247, 28 L.Ed. 798.

Appellant's Specification of Errors

Appellant relies for reversal on eight claimed errors. In the first six, appellant asserts that the court erred:

(1) in determining that the law of Ohio accords a patentee the qualified privilege to publish a charge of patent infringement to other interested persons, even though the charge later proves to be false, if the patentee reasonably and in good faith believes the charge of infringement to be true and was not prompted by malice but acted solely in defense of his patent; that such a publication is qualifiedly privileged, and that defendant's good faith and absence of malice constitutes a complete defense to plaintiff's claim of unfair competition or trade libel;

(2) in failing to find that the Ohio case law, the Ohio statutes, the Ohio Constitution, and the Treaty of Paris all make actionable the publication of false charges in the conduct of trade which are of a nature to discredit the establishment, the goods or the services of a competitor without regard to proof of actual malice;

(3) in determining that the defendant published the charges in good faith and without malice, that it reasonably believed that the patent in suit was infringed by the process of plaintiff, and that this belief was based upon the opinion of patent counsel and not upon careless ascertainment of plaintiff's rights;

(4) in determining that plaintiff "published the charge of infringement in Ohio" and that defendant's publications were published "in response to plaintiff's publication in Ohio" and in "response to plaintiff's prior publication in a trade magazine";

(5) in determining that the defendant's misrepresentations at the original trial were not material;

(6) in finding that the instant case was not warranting an allowance of attorney's fees.

The remaining two claims of error are that the court erred in adjudging that plaintiff shall take nothing by its claim for damages and that said claim for damages be dismissed and in failing to award plaintiff its actual damages, namely, its business losses resulting from the publication, and the expenses involved in clearing up of the infringement charges; and further erred in adjudging that plaintiff shall not receive any attorney's fees and in failing to award attorney's fees to plaintiff under the patent statutes and under the Ohio law.

### Appellant's Position

In support of its Specification of Errors, appellant presents lengthy arguments and an elaborate array of authorities thought to support its position. It abruptly parts company with the lower court's views on "Ohio law" as applied to the facts we have outlined above. Specifically it argues that Henry Gehring Co. v. McCue, 1926, 23 Ohio App. 281, 154 N.E. 171 and McCue v. Wells, 1929, 121 Ohio St. 53, 166 N.E. 892, establish and directly show the law of Ohio to be as follows: (1) Where a plaintiff seeks damages arising from the publication of a false charge of infringement, existence of *malice* and absence of *good faith* are not essential elements of plaintiff's case, (2) proof of the *truth* of the matter charged as defamatory is a complete defense (3) the fact that the letters which charged infringement were written and sent in good faith and upon advise of competent counsel skilled in such matters is not a defense to a plaintiff's claim for damages.

In further support of the doctrine just above noted, it is urged that Watson v. Trask, 1834, 6 Ohio 532, firmly established as "Ohio law" that (as applied to the facts of the instant case) appellee's charge that appellant infringed appellee's patent was a personal libel directed at appellant, and if the charge was false, Ohio law *infers malice* on the part of appellee in making this charge. If falsity is present (says appellant) Ohio law, as set forth in Henry Gehring Co. v. McCue and McCue v. Wells, supra, along with the "general law" as set forth in American Well Works v. Layne, 1916, 241 U.S. 257, 36 S.Ct. 585, 60 L.Ed. 987; E. Edelmann & Co. v. Triple-A Specialty Co., 7 Cir., 1937, 88 F.2d 852, and International Industries & Development v. Farbach Chemical Co., Inc., D.C., 145 F.Supp. 34, affirmed in 6 Cir., 241 F.2d 246, and the treaty law as set forth in the Treaty of Paris (above referred to), all agree that *actual malice* is not an essential element of a (appellant's) claim for damages.

Boiled down, the argument is that appellee's false charge [8] that the Kemart Process infringed its Marx patent, is "actionable per se as a matter of law" without proof of malice on the part of appellee and without regard to the question of appellee's good faith, protection of its patent, and advice of competent counsel. And it is said that as to this theory, "the historical starting point of Ohio case law is Watson v. Trask," supra, it being the vanguard of "the better reasoned cases."

Appellant also argues that *if* the law of Ohio be held not applicable, it relies *directly* upon International Industries & Development v. Farbach Chemical Co., Inc., supra, and upon pertinent comments in American Well Works v. Layne, supra; American Ball Co. v. Federal Cartridge Corp., 8 Cir., 1934, 70 F.2d 579, 98 A.L.R. 665; dissenting opinion in Eastern States Petroleum Co. v. Asiatic Petroleum Corp., 2 Cir., 1939, 103 F.2d 315; Black & Yates v. Mahogany Ass'n, 3 Cir., 1941, 129 F.2d 227, 148 A.L.R. 841, certiorari denied, 317 U.S. 672, 63 S.Ct. 76, 87 L.Ed. 539 and E. Edelmann

8. As to the "falsity of the publication" angle, it was conceded at trial that appellee's charge of infringement against appellant was finally adjudicated in appellant's favor (201 F.2d 624) and thus the falsity of appellee's said charge was *judicially established.*

& Co. v. Triple-A Speciality Co., supra. The emphasis of appellant is on the point that at trial appellee failed to establish that appellant did infringe its Marx patent; that appellee was therefore liable in damages because of its earlier false though honestly believed charge of infringement, and its later unsuccessful suit against appellant for infringement (in which its counterclaim pleaded infringement in this litigation). Thus appellee's published and false notices of infringement became actionable because done with *malice in law* which is implied from the bare publication thereof.

In Part II of this opinion we consider the issues of law which arose out of the factual situation portrayed in Part I.

### PART II

As appears below, the initial problem to be considered is which substantive law should be applied to the above noted fact situation so far as it pertains to the issue of liability of Printing Arts for making known to members of the photoengraving trade certain charges of infringement against Kemart. This issue (of liability) arose out of a separate claim in Kemart's petition for declaratory judgment, as noted in Part I of this opinion.

It is clear that in any event, the lower court had jurisdiction as to Kemart's cause of action based on liability of Printing Arts since there did in fact exist a diversity of citizenship between the parties, but other grounds for jurisdiction may also be present. Though these additional grounds in no way affect the primary power of the District Court to act in the matter, they raised a problem as to the proper substantive law to be applied to the facts of the case.

■ It is clear that if the jurisdiction of the lower court was based solely upon the ground of diversity of citizenship, the proper law to be applied is that of the state wherein the district court is located. Erie v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188; Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. However, two theories are advanced to support the proposition that a case of the nature now before us is controlled by federal substantive law.

■ First, appellant contends that the Convention for the Protection of Industrial Property of the Union of Paris, as amended (53 Stats. at L.1748 et seq., hereafter Paris Convention), sets out a substantive law of unfair competition which is controlling over all state laws.

Article 1 of the Paris Convention (53 Stats. at L.1772) states in part:

"(2) The scope of the protection of industrial property shall include * * * the repression of unfair competition."

Article 2 makes the provisions of the Paris Convention applicable to the nationals of the signatory countries within their respective nations. It provides for the enjoyment by the said nationals of all the rights presently granted by their respective laws "without any prejudice to the rights specially provided for by the present convention * * *."

In expanding upon the reference in Article 1 to "unfair competition," Article 10 *bis* (53 Stats. at L.1780) provides:

"(1) The countries of the Union are bound to assure to nationals of countries of the Union an effective protection against unfair competition.

* * * * * *

"(3) The following particularly are to be forbidden:

* * * * * *

"2°. False allegations in the conduct of trade of a nature to discredit the establishment, the goods, or the services of a competitor."

In this connection appellant contends:

(1) that the Paris Convention is part of the controlling domestic law of the United States;

(2) that by the Paris Convention's silence, it *eliminates* the defenses of good faith and privilege raised by appellee here. We cannot agree.

Assuming, arguendo, that the Paris Convention is a part of the controlling domestic law of the land, it is clear that it was not intended to preclude any and all defenses of privilege for false statements concerning a competitor's product. If such defenses were precluded, the protection given by an American patent would be effectively diminished and thereby give rise to a serious constitutional question.

Appellant's contention (that the failure of the Paris Convention to mention privilege as a defense) forces the untenable conclusion that *no* such defenses were to be allowed. If such an interpretation of the Paris Convention were to prevail it would necessarily be applicable to all defenses of privilege whether they be "absolute" or "qualified". Thus, under appellant's interpretation, a patentee would be precluded from bringing a suit charging infringement unless he was willing to run the risk of being held liable for damages in the event he failed to prove this charge. The basis upon which such an action for damages would be brought against the unsuccessful litigant could be *the allegation of infringement appearing in his complaint.* Clearly the ratifiers or implementers of the Paris Convention never intended to exclude privilege which protects allegations in a complaint. Such, however, would be the result (in the absence of subsequent domestic legislation) were we to apply what seems to be appellant's interpretation of the application of 10 *bis.*

■■ We can only conclude that the Paris Convention was not intended to define the substantive law in the area of "unfair competition" of the signatory countries, but rather to set out the broad basic principles under which the laws of the said countries would operate. In this country it has long been the rule that false allegations concerning a competitor's product are "unfair" *unless* the specific allegations are privileged. The Paris Convention neither adds nor subtracts from that rule and is not applicable to the instant case.

■ The second possible theory under which federal substantive law could be applied to the facts of the instant case would seem to rest upon jurisdiction arising under 28 U.S.C.A. § 1338(b) which provides:

"The district courts shall have original jurisdiction of any civil action asserting a claim of *unfair competition* when joined with a substantial and related claim under the copyright, *patent* or trade mark laws." [Emphasis supplied.]

Certain decisions arising under the foregoing section find the rule of Erie v. Tompkins, supra, inapplicable and resort to pre-Erie federal case law. Bulova Watch Co. v. Stolzberg, D.C., 69 F. Supp. 543, 546; Carter Products v. Colgate-Palmolive Co., D.C., 130 F.Supp. 557, 571, affirmed without mention of this point, 4 Cir., 230 F.2d 855, certiorari denied, 352 U.S. 843, 77 S.Ct. 43, 1 L.Ed. 2d 59, rehearing denied 352 U.S. 913, 77 S.Ct. 152, 1 L.Ed.2d 120. The prevailing view, however, is that the rule of Erie v. Tompkins is applicable to the *unfair competition* issue raised under 1338(b) even though federal law is applicable to the "related claim under the copyright, patent or trade mark laws." Time, Inc. v. Viobin, 7 Cir., 128 F.2d 860, 862, certiorari denied 317 U.S. 673, 63 S.Ct. 78, 87 L.Ed. 540; Rytex Co. v. Ryan, 7 Cir., 126 F.2d 952, 954; Maternally Yours, Inc. v. Your Maternity Shop, 2 Cir., 234 F.2d 538, 540; cf. Philco Corp. v. Phillips Mfg. Co., 7 Cir., 133 F.2d 663, 148 A.L.R. 125.[9]

■ We conclude that regardless of whether appellant's cause of action for

---

9. It has been stated that this court is not in accord with this view, but rather is of the opinion that § 44 of the Lanham Act, 15 U.S.C.A. § 1126 creates a "substantive federal law of unfair competition wherever interstate commerce is in-

volved," Maternally Yours, Inc. v. Your Maternity Shop, 2 Cir., 234 F.2d 540, supra (footnote 1) citing Stauffer v. Exley, 9 Cir., 184 F.2d 962 and Pagliero v. Wallace China Co., 9 Cir., 198 F.2d 339. We do not find it necessary to decide, at

damages arising out of Printing Arts' allegedly "wrongful acts and doings" was one of "unfair competition" appended (by virtue of 28 U.S.C.A. 1338(b)) to its claim arising under the patent laws, or was one of libel having standing in the court below solely by virtue of the diversity of citizenship between the parties, the applicable law is that of the state of the forum.

■■ It is settled (and was so held by the lower court) that when a federal district court applies the substantive law of the state of the forum, the conflict of laws rules of that state are applicable, Erie R. Co. v. Tompkins, supra; Klaxon Co. v. Stentor Electric Mfg. Co., supra, 313 U.S. at page 496, 61 S.Ct. 1020. Under the law of California, a tort action is governed by the law of the place where the tort is committed, Loranger v. Nadeau, 215 Cal. 362, 10 P.2d 63, 65, 84 A.L.R. 1264; Wallan v. Rankin, 9 Cir., 173 F.2d 488, 490.

On the point just above mentioned appellant contends that the tort here in question was committed in the State of Ohio and indeed there is evidence in the record that one publication (the first) of the offensive charge of patent infringement was actually made by Printing Arts in 1948, in the State of Ohio. In fact, this 1948 publication was the only publication of the charge of patent infringement which was made by Printing Arts prior to the instigation of the Kemart suit. However, it should be noted that whatever the damages to Kemart shown in the record, they did not flow from this publication. There is no evidence whatever in the record that the publication of Printing Arts' claim of infringement by Kemart at the 1948 Cleveland Convention resulted in any actual damage to Kemart.

To the contrary, there is no hint of unfavorable feeling toward Kemart by its customers *prior* to November 23, 1948, at which time the above noted Kemart letter advised its licensees of its then commencement of the present litigation. All evidence related to the cancellation of Kemart licenses, or refusal to enter into license agreements, concerns incidents which occurred *subsequent* to the publication of the May, 1949, issue of the Photoengravers Bulletin and is directly attributable to Printing Arts' charge of patent infringement which appeared in that issue of the Bulletin, or in subsequent publications of the complained-of disparaging material.

It is clear, therefore, that more than one allegedly wrongful act is involved in the proof appearing in the record. The first publication, be it either a libel or an "injurious falsehood" in the nature of unfair competition, occurred at the Cleveland Convention, but no special damages to Kemart are shown to have resulted from this Ohio incident. The subsequent publications appeared in various issues of trade magazines (i.e., The Photoengravers Bulletin, The National Lithographer and the "Research Bulletin" of the ANPA, see note 5) distributed on a *national scale* to members of the Photoengravers trade and to publishers using a photoengraving process. It is from these latter publications that any damage to Kemart shown in the record, actually occurred.

■ Regardless of the applicable state law, the problem presented by the facts shown here must be handled in essentially the same manner. It is clear from the record (and is not challenged by the parties) that all the publications attributable to Printing Arts were disparaging either to the "person" or the property of

---

this time, whether this is indeed the view of this court under circumstances involving common law trade marks. The Stauffer case is self-limiting when it states at page 965:

"The protection granted by the Lanham Act against unfair competition, how-

ever, is limited by § 1126(h) of the Act to 'the remedies provided in this chapter for *infringement of marks* * * * so far as they may be appropriate in repressing acts of unfair competition.' * * *" [Emphasis added.]

Kemart. The lower court found that, with regard to each of these publications, Printing Arts acted without malice in an effort to protect what it reasonably believed to be its valid and existing property rights. These efforts were reasonably calculated to adequately protect its claimed rights without *unnecessary* damage to the parties concerned. In this manner the elements of the defense of privilege were brought into the record.[10] Although this defense was not pleaded by appellee at the commencement of this action, the trial court correctly ruled that this failure shall not affect the decision of those issues when they are tried "by express or implied consent of the parties * * *" Fed.R.Civ.Proc. 15(b).

 The law of Ohio (which is clearly applicable to the claim arising from the first (1948) publication) does not preclude the defense of privilege. The case of Watson v. Trask, supra, heavily relied upon by appellant, merely holds that to charge a man with patent infringement is a libel. That case does *not* stand for the proposition that such a libel may not be qualifiedly or absolutely privileged. Nor do the other cases cited by appellant *preclude the defense of privilege.* Appellant's primary argument is to the effect that the "defense of good faith" is precluded by Ohio law. *This is not the issue.* Good faith is not the defense raised, rather it is merely an important element or part of the *quali-*

*fied privilege* which is here claimed as a defense by appellee.

 It is the general rule in the United States that a qualified privilege is recognized in cases where the publisher and the recipient of the publication have a common interest which might be reasonably believed to be protected or furthered by the publication and the publication is made reasonably and in good faith. Prosser, Handbook of the Law of Torts (2d ed., 1955) pp. 606, 618–619. This privilege has been recognized in Ohio, De Angelo v. W. T. Grant, Ohio App., 111 N.E.2d 773; McKenna v. Mansfield Leland Hotel Co., 55 Ohio App. 163, 9 N.E.2d 166. Though these cases involve disparagements made by an employer concerning an employee, the *privilege* involved is the same as that involved in the instant case. Both Printing Arts (the publisher) and the recipient members of the photoengraving industry attending the convention had an interest (in this case a pecuniary interest) in the subject matter of the publication. Nor is the fact that the De Angelo and McKenna cases involved "slander" rather than "libel" of importance in determining the *existence* of a privilege.

 The record shows that, as to the (1948) Ohio publication, Printing Arts was well within the recognized privilege. There being no showing of "actual malice" or absence of good faith on the part of Printing Arts, and the publication being limited to interested parties, it is

---

10. Appellant challenges the finding of the trial court that the charges were published in good faith and without malice on the ground that the charge was based upon the advice of interested counsel. Appellant asserts that "advice of counsel" is *not a defense* in a libel action.

However, the basis of Printing Arts' defense, as indicated by the record, is that of "privilege" rather than advice of counsel. As will be discussed later in this opinion, the absence of "actual malice" is one of the elements of this defense (privilege). Proof of "advice of counsel" was introduced in testimony and exhibits by Printing Arts to indicate its lack of "actual malice" in the present case. If appellee believed its charge of infringement to be true, and if it was reasonable for it to so believe, there was no "actual malice" on its part, hence one of the required elements of the defense of "privilege" was established. The fact that McCaleb informed Marx of his (McCaleb's) belief that the Kemart process infringed that Marx Patent and that McCaleb was an experienced and otherwise qualified patent attorney, was merely evidentiary of the fact that Marx believed the charge to be true, and further, that since at least one qualified patent attorney believed it to be true, it was reasonable for Marx to so believe.

clear that there was no overstepping of the privilege. Therefore, appellee cannot be held liable for this particular publication.

█ The second and apparently most important publication by Printing Arts was made in the May, 1949, issue of the Photoengraver's Bulletin, a trade journal which circulates to "everyone in the industry". Subsequent publications were also made, one in the June, 1950, issue of the aforementioned Bulletin and a second in the National Lithographer for the same month.[5] This latter magazine is the equivalent trade journal for lithographers.

The record and exhibits before this court do not reveal the publishing data for all the journals in which the complained of charges of patent infringement appeared. However, an issue of the Photoengravers Bulletin for July of 1947 which appears among the exhibits, indicates that the actual printing of the Bulletin takes place in the State of Illinois. At any rate, it is clear from the testimony in the record that all of the magazines involved are circulated nationally to members of the respective trade groups. Though undoubtedly this included some persons in Ohio, it also included recipients throughout the nation. As to these later disparagements, they must be regarded as "multi-state" in nature without an easily locatable situs of applicable law.

The problem of determining the applicable substantive state law to be applied to a multi-state publication of claimed defamatory material is not a new one but the solutions reached by the cases have been far from uniform. In federal courts, the cases have ranged all the way from requiring the trial court to determine and apply the law of each jurisdiction in which a claimed defamation was published (Hartmann v. Time, Inc., 3 Cir., 166 F.2d 127, 1 A.L.R.2d 370, certiorari denied 334 U.S. 838, 68 S.Ct.

1495, 92 L.Ed. 1763); through the application of the law of the plaintiff's place of domicile (Estill v. Hearst Pub. Co., 7 Cir., 186 F.2d 1017), to a complete ignoring of the problem with a resultant application of the law of the forum (Spanel v. Pegler, 7 Cir., 160 F.2d 619, 171 A.L.R. 699). Nor have the law reviews been silent on the subject.[11] Though not in agreement as to what is the best solution as the law presently stands, the authors appear to be in general agreement that a federal statute would provide the only real solution to the problem. Unfortunately, Congress has not yet acted. Nor does there appear to be an applicable decision in the State of California to direct us as to which of the mass of confusing, conflicting and contradictory rules we should apply.

In the instant case, both parties have strong contacts with the State of California. Appellant (plaintiff below) is a California corporation and though appellee is a Delaware corporation, both parties have their principal place of business in the State of California. The trial forum was a California federal court. Publication of the disparaging material being nation-wide, it seems apparent that the criticized publications did occur in California. Lastly, the record indicates that some damage to Kemart may have occurred in California.

Although certain of the contacts of the contending parties are not limited to the State of California (i.e., publication and damages), no other jurisdiction can claim any of the other mentioned contacts of forum, principal place of business of both parties, and the domicile of the plaintiff.

It is clear from the above that the State of California is the state having the closest relationship to the parties involved in the present litigation and has contacts with the subject matter of the litigation concerning the publications of

5. See Note 5 on Page 383.

11. Prosser, "Interstate Publication", 51 Mich.L.R. 959, lists 10 different sys-

tems which have been used or suggested for making the "choice of law" in these problems. See also: 14 Ohio State L.R. 96; 28 NYULR 1006.

the charge of patent infringement subsequent to the publication at the Cleveland Convention, equal or superior to any other state. Thus it is only fitting and proper that the law of California should be the substantive law governing this litigation.[12]

The law of California is clear in respect to privileged publications of claimed defamatory material. Section 47 of the California Civil Code provides:

"A privileged publication or broadcast is one made—

\* \* \* \* \*

"3. In a communication, without malice, to a person interested therein, (1) by one who is also interested \* \* \*"

■ In the instant case, the publisher of the claimed defamation (Printing Arts) is the holder of a competing patent. The recipients of the claimed defamatory publications were the present and the prospective licensees of the here competing patent owners. Both are financially interested in the subject matter of the claimed defamation and thus clearly come within the terms of the stated privilege. It is unnecessary to determine whether the tort involved in the instant case is one for unfair competition or one for libel since the California courts have applied the above statutory privilege to both types of wrongs.[13]

■ Since the claimed defamations appearing in the Bulletin and the other "trade" journals were privileged, it was necessary for Kemart, in order to prevail, to show "actual malice" as distinguished from malice inferred from the false communication in and of itself. Cal.Civil Code § 48;[14] Brewer v. Second Baptist Church of Los Angeles, 32 Cal. 2d 791, 197 P.2d 713; Miles v. Rosenthal, 90 Cal.App. 390, 266 P. 320. The "actual malice" required to overcome the statutory privilege is to be distinguished from that sometimes inferred from the intentional doing of a wrongful act without justification. Snively v. Record Pub. Co., 185 Cal. 565, 198 P. 1; Harris v. Curtis Pub. Co., 49 Cal.App.2d 340, 121 P.2d 761. In the instant case, the trial court made a specific finding that no such malice existed on the part of Printing Arts and that the said Printing Arts had reasonable cause to believe that its charge of patent infringement by the Kemart process was true. The only conclusion which this court can reach is that Printing Arts was qualifiedly privileged in making the complained-of publications and that this privilege was not overcome by an adequate showing of malice. Printing Arts cannot, therefore, be held liable for the damage flowing from those publications.

Turning now to appellant's contention that the trial court erred in failing to

12. This technique of determining the applicable state law is similar in nature to the rule applied in Dale System, Inc. v. General Teleradio, D.C., 105 F.Supp. 745, 748, 749, wherein the court listed five "dominant contacts". (1) "Substantive law of the forum"; (2) "Place of last event"; (3) "Point of origination"; (4) "State of principal circulation"; and (5) "Domicil of the plaintiff." The court, in the Dale case found three of these "contacts" to be unequivocally in the State of New York and therefore applied the law of that state. In the instant case, only two of the "dominant contacts" used in Dale System are unequivocally within California (i. e., forum and domicile of the plaintiff), but of the remaining three, only one of these may be placed "unequivocally" in another jurisdiction (i. e., "point of origination"—Illinois). In addition, California is the location of the principal place of business of both of the parties. It would seem that the here "dominant contacts" are firmly lodged in the State of California.

The Supreme Court has used a similar method of selecting applicable law in an admiralty case. Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254.

13. Applied to unfair competition, Gudger v. Manton, 21 Cal.2d 537, 134 P.2d 217; applied to libel, Brewer v. Second Baptist Church of Los Angeles, 32 Cal.2d 791, 197 P.2d 713; Shoemaker v. Friedberg, 80 Cal.App.2d 911, 183 P.2d 318.

14. Cal.Civ.Code § 48 "In the case provided for in subdivision 3 of the preceding section [Cal.Civ.Code § 47(3)] cited supra, malice is not inferred from the communication."

**394**

award appellant attorney's fees as provided in 35 U.S.C.A. § 285, we find no error in the lower court's denial of such fees.

■ Section 285 provides for the award of attorney's fees only in exceptional cases. Determining whether a given case is an "exceptional" one is a decision within the discretion of the trial judge, Jacquard Knitting Mach. Co. v. Ordnance Gauge Co., 3 Cir., 213 F.2d 503, 509, and this court will reverse such a determination only when there has been a clear abuse of discretion "amounting to caprice or an erroneous conception of law on the part of the trial court." Photochart v. Photo Patrol, 9 Cir., 189 F.2d 625, 629, certiorari denied 342 U.S. 867, 72 S.Ct. 107, 96 L.Ed. 652, rehearing denied 342 U.S. 907, 72 S.Ct. 290, 96 L.Ed. 679.

Judge Hastie, writing for this court in Park-In-Theatres v. Perkins, supra, indicates that it is incumbent upon the trial court to apply a "strict standard in finding cause adequate to justify an allowance of attorney's fees." He states 190 F.2d at page 142:

"The exercise of discretion in favor of such an allowance should be bottomed upon a finding of unfairness or bad faith in the conduct of the losing party, or some other equitable consideration of similar force, which makes it grossly unjust that the winner of the particular lawsuit be left to bear the burden of his own counsel fees which prevailing litigants normally bear." [15]

■ In its opinion, the trial court held that the appellee acted in a reasonable manner before, during and after the trial of the infringement issue. [See 146 F.Supp. 21, 24.] We find no reason to disagree with the conclusion of the trial judge and the finding in accord with it. Though certain testimony of one of appellee's witnesses, with reference to his qualifications is to be criticized, the

incident was not of a character which would justify us in holding that the trial court abused its discretion in disallowing attorney's fees. Nor do we feel that the representations concerning the state of the prior art which were made by appellee at the trial of the infringement issue, were such as to give rise to the "unfairness or bad faith in the conduct of the losing party" or the "other equitable consideration of similar force" necessary to bring the present case within the "exceptional cases" included in the statute. We conclude that the trial court exercised his discretion properly.

The judgment is affirmed.

---

15. See also Faulkner v. Gibbs, 9 Cir., 199 F.2d 635, 641–642, affirmed 338 U.S. 267, 70 S.Ct. 25, 94 L.Ed. 62, rehearing denied, 338 U.S. 896, 70 S.Ct. 236, 94 L. Ed. 551.