[Civ. No. 2937. Fourth Dist. Jan. 27, 1942.]

W. J. HARRIS, Appellant, v. CURTIS PUBLISHING COMPANY (a Corporation) et al., Respondents.

Joseph Scott, J. Howard Ziemann and Cuthbert J. Scott for Appellant.

Macdonald & Pettit, Alexander Macdonald and John L. Rowland for Respondents.

BARNARD, P. J.—This is an action for libel. At the conclusion of the defendants' case they moved for a directed verdict on the grounds that the complaint does not state a cause of action, that the evidence is not sufficient to show that the article in question is a libel upon the plaintiff, and that the evidence discloses without conflict that the article in question was privileged in that it was a communication without malice to a person interested by another also interested. This motion was granted and a verdict in accordance with such a direction was returned by the jury. The plaintiff has appealed from the judgment which followed.

The first question requiring consideration is whether the complaint states a cause of action. So far as material here, the complaint alleges that the plaintiff is a painter and decorator doing business in the city of Laguna Beach and is the president of the school board of that city; that the defendants maliciously and knowing it to be false and unprivileged and with the intent and design to injure, disgrace and defame the plaintiff and to bring him to discredit and obloquy, published the article in question; that the plaintiff has always conducted himself in his business and in his official position with honesty and fidelity and with concern for the welfare and proper ideals of citizenship of the school children of said city, and has at all times enjoyed the esteem and respect of his fellow citizens; that said publication was false and defamatory and unprivileged and by means thereof the defendant is and has been greatly injured and prejudiced in his reputation and has also lost gains and profit which would otherwise have accrued to him in his business to his damage in the sum of $20,000; that said publication was knowingly false, defamatory and unprivileged and was made by the defendants through ill will and malice toward plaintiff and with the intent to injure him in his professional standing and reputation and to discredit and defame him, to bring him into public discredit, contempt and ridicule, by reason whereof he asks for exemplary and punitive damages in the sum of $20,000; and that a timely demand for a retraction was duly served upon one of the defendants pursuant to section 48a of the Civil Code, but no retraction was forthcoming within the time allowed by that section. The article in question, as set forth in the complaint, appeared in the December 2, 1939, issue of the Saturday Evening Post as one

of a number of articles under the heading "We See by the Papers." The article reads as follows:

"Laguna Beach, Calif.: Schools in this Southern California beach town are in their sixth semester without a students' savings-bank system. Such systems, with the children operating their own banks, making deposits and withdrawals and using regular bank as main depositories, are usual in about 2,000 California public schools. They were started thirty years ago by the Bank of America, to teach children thrift and ordinary banking procedure. But a few weeks after being established here in 1937, the local school board ordered them out under a policy of 'not permitting any organization to use the schools for advertising purposes.' Carl E. Benson, plumber and board member, who introduced the resolution, said recently: 'I think it's wrong to let big corporations into our schools.' W. J. Harris, painter and decorator, board president, addressing the Rotary Club here, said: 'Why should kids save, anyway? We are going to have old-age pensions, and kids should spend their money and let the government take care of them when they are old.' Laguna Beach includes several hundred Communists, some of whom are movie stars who commute the fifty-seven miles daily to Hollywood."

"Libel is a false and unprivileged publication by writing . . . which exposes any person to hatred, contempt, ridicule or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, sec. 45.) A publication falling within the terms of this statute is a libel *per se*, and in such a case it is unnecessary to allege in the complaint matters of innuendo, inducement or special damage. (*Bates* v. *Campbell*, 213 Cal. 438 [2 Pac. (2d) 383].) Where the publication is not libelous *per se* the matters referred to must be alleged in order to state a cause of action. (*Grand* v. *Dreyfus*, 122 Cal. 58 [54 Pac. 389]; *Vedovi* v. *Watson & Taylor*, 104 Cal. App. 80 [285 Pac. 418]; *Edwards* v. *San Jose Printing & Pub. Soc.*, 99 Cal. 431 [34 Pac. 128, 37 Am. St. Rep. 70]; *Pollock* v. *Evening Herald Pub. Co.*, 28 Cal. App. 786 [154 Pac. 30].)

The complaint here alleges nothing in the line of innuendo, inducement or special damage and its sufficiency depends upon whether or not the publication in question is libelous *per se*. In *Bettner* v. *Holt*, 70 Cal. 270 [11 Pac. 713], it was

held that in interpreting the language of a publication charged to be a libel a court should construe the words used in the light of the whole scope and apparent object of the writer, and considering not only the actual language used but the sense and meaning which may fairly be presumed to have been conveyed to the readers. In *Rosenberg* v. *J. C. Penney Co.*, 30 Cal. App. (2d) 609 [86 Pac. (2d) 696], the court quotes with approval the rule thus laid down in Newell on Slander and Libel:

" 'When language is used concerning a person or his affairs which from its nature necessarily must, or presumably will as its natural and proximate consequence, occasion him pecuniary loss, its publication *prima facie* constitutes a cause of action and *prima facie* constitutes a wrong without any allegation or evidence of damage other than that which is implied or presumed from the fact of publication; and this is all that is meant by the terms "actionable *per se*," etc. Therefore the real practical test by which to determine whether special damage must be alleged and proven in order to make out a cause of action for defamation is whether the language is such as necessarily must or naturally and presumably will occasion pecuniary damage to the person of whom it is spoken.' "

In *Noral* v. *Hearst Publications, Inc.*, 40 Cal. App. (2d) 348 [104 Pac. (2d) 860], the court said:

"Charges of libel against a publication which has reported or commented upon matters involving public policy should be viewed with caution. It is in such matters that the freedom of the press is of paramount concern. Without such freedom, the march of progress might be stayed or the venom of alien cultures might stealthily undermine cherished landmarks. 'It is far better for the public welfare that some occasional consequential injury to an individual, arising from general censure of his profession, his party, or his sect, should go without remedy, than that free discussion on the great questions of politics, or morals, or faith should be checked by the dread of embittered and boundless litigation.' (*Ryckman* v. *Delavan*, 25 Wend. (N. Y.) 186, 199.) "

In construing the effect of language alleged to be libelous it is also necessary to consider the publication as a whole. (*Stevens* v. *Snow*, 191 Cal. 58 [214 Pac. 968].)

Applying these rules to the publication before us we

are of the opinion that it is not libelous *per se*. The article as a whole is a narration of asserted facts with respect to the absence of a students' savings bank system in the Laguna Beach schools and the policy of the board under which such a savings system was ordered out of the schools after having been once established. The portion which the appellant claims to be libelous *per se* as to him is the latter part, in which he is stated to have said: "Why should kids save, anyway? We are going to have old-age pensions, and kids should spend their money and let the Government take care of them when they are old," and the final sentence to the effect that Laguna Beach contains several hundred Communists, some of whom are movie stars who commute to Hollywood. In support of his contention that this matter is libelous *per se*, it is first argued that the statement attributed to the appellant had a natural tendency to injure his reputation generally and with respect to his occupation since he was no mere citizen but the president of a school board and, as such, supervisor of the daily conduct of hundreds of children, and that in addition to its presumed effect there is evidence of its actual effect in his own testimony that he recalled many instances, after the publication of the article "where people that I had been on hailing signs with, simply turned their heads the other way when they saw me coming down the street." Regardless of any question as to the sufficiency of this evidence we are here concerned only with the allegations of the complaint. With respect to the final sentence of the published article it is further argued that it, read in connection with the rest of the article, was libelous *per se* because it was intended thereby to refer to the appellant as a Communist, as shown by the fact that the statement previously attributed to him expresses a view which would be approved by the average Communist.

Viewed as a whole, the article in question is a criticism of the policy of this school board in eliminating the students' savings bank system. Inferentially, at least, the reasons for that policy are criticized, including one which may be implied from the statement attributed to the appellant to the effect that children should spend their money and let the government take care of them in their old age. That statement is, in itself, but the expression of a political or economic point of view and it is a part of an entire article which is a comment upon a matter of public policy. Moreover, the point of view thus attributed to the appellant was one which was, at the

time, quite prevalent. That point of view had recently found widespread expression in this state through popular movements of very considerable strength as, for example, in the "Epic" campaign with its program of production for use and extensive pension systems, in the Townsend plan with its clubs in every locality, and in the so-called "Ham and Eggs" campaign of the year before. The views attributed to the appellant were closely associated with the general views widely spread through California through these movements, as well as by other means, and they are practically identical with a part of the points of view represented by those movements. On the day this is written the newspapers report that a justice of the peace in a city a few miles from Laguna Beach has just held that the state law requiring grown sons and daughters to support their parents is unconstitutional, saying: "It is the duty of the state to care for indigent persons." The point of view to which we have been referring was not entirely absent in the national scene at and prior to the time this article was published, where it found much encouragement in the general attitude, policies and teachings of the national government as these were interpreted and accepted by a large part of our population.

With these circumstances in mind and considering the article as a whole, the criticized portions should be construed in the light of the apparent object of the writer and the meaning that would naturally be conveyed to the readers, with the effect upon them that may reasonably be anticipated. We are unable to hold that in commenting upon such a question of public policy the inclusion of a statement attributing to a public official economic views of a sort which were then held and accepted by a large part of our population is, in itself and *per se,* a holding of that person up to hatred, contempt or ridicule or that it would presumably cause him to be shunned or avoided, or that it necessarily must or presumably will have a natural tendency to injure him, and much less that it will presumably and as a proximate consequence cause him pecuniary loss. In our opinion, this case is a good example of the class of cases where a mere setting forth of the language used is not sufficient and where a further explanation by way of innuendo, inducement and allegation of special damage is required in order to disclose just how and why it is claimed that the language alleged to be libelous has injuriously affected the complainant in a legal sense.

The appellant himself recognizes that matters of broad general policy were involved in the publication in question since he alleges in his complaint that at all times as president of this school board he has had, ''concern for the welfare and proper ideals of citizenship of the school children.'' In *Snavely* v. *Booth*, 36 Del. 378 [176 Atl. 649], the court said: ''We have been referred to no authority, nor have we been able, in an extended search, to find authority, holding that criticism of mere opinion or theory is actionable defamation.'' The statement in question not only related to a matter of public policy of general interest but it was not of such a character that injury must be presumed from the language itself and without the necessity for explanation and specific application.

With respect to the final sentence of the published article it does not necessarily or presumably appear that it refers to this appellant. The article, as a whole, refers to the city of Laguna Beach as well as to its school system. It makes a general reference to the entire school board, and a specific reference to things allegedly said by the appellant and also by another member of that board, and follows this by another general statement. The fact that the concluding sentence is in such general terms is a further indication that the intent and purpose of the article was to criticize a point of view and policy being carried out in that community rather than to attack any individual. Not only is there no direct charge that the appellant is a Communist, whatever the precise meaning intended by that word which has very generally been loosely applied to persons of almost every conceivable point of view, but such a charge is not necessarily to be implied. If it could be so implied there would still be a question whether that alone is libelous *per se*. The necessity for pleading innuendoes where the charge is that a person has been accused of being a Communist seems to be recognized in *Gallagher* v. *Chavalas*, 48 Cal. App. (2d) 52 [119 Pac. (2d) 408], and in the cases there cited. ▮ Moreover, a complaint for libel is insufficient where the publication does not defame an ascertainable person. (*Noral* v. *Hearst Publications, Inc., supra.*)

The precise question here presented is new, which is not surprising since attacked publications are usually not alike nor even similar, and since there have been so few cases involving an attack upon political or economic opinions or theories, especially where they were not accompanied by

charges of criminal or traitorous acts. Naturally each case of this nature must be considered in reference to its own facts and surrounding circumstances. We conclude, upon the particular facts here involved, that this publication was not libelous *per se* and that the complaint failed to state a cause of action.

Nor do we think the appellant is in any better position if the complaint be held sufficient, since the evidence disclosed without substantial conflict that the publication was privileged under section 47 (3) of the Civil Code. The answer alleged, among other things, that this publication was privileged under this section; that it was published in the honest belief that all statements therein were true; and that there was no malice or intent to injure the plaintiff. That section of the code provides that a privileged publication is one made "In a communication, without malice, to a person interested therein, by one who is also interested." The malice referred to in this statute must be express or actual. (*Davis* v. *Hearst*, 160 Cal. 143 [116 Pac. 530].) While such malice may not be "inferred from the communication or publication" (sec. 48, Civ. Code), it has been held that actual malice may be inferred "where the charge is false and is libelous *per se* and the defendant publishes it without having probable cause for believing it to be true." (*Snively* v. *Record Publishing Co.*, 185 Cal. 565 [198 Pac. 1].)

It is first contended that this publication was not a communication between interested persons within the meaning of this statute. It has been held that a newspaper publication concerning one holding public office comes within the purview of this statute. (*Snively* v. *Record Publishing Co., supra.*) The appellant argues that this was so held in that case only as to comments concerning a local officer by a newspaper published and circulated in that particular community. He then cites several Wisconsin cases as holding that a newspaper having a wide circulation had no direct or legitimate interest in certain conduct of an officer in a small community in which there was but "an inconsequential portion of its circulation" and argues that a similar rule should be here applied. In those cases there was a direct attack upon the personal fitness of the plaintiff for a local office which was largely and mainly circulated among persons who resided elsewhere and who had no direct interest in the way the office was conducted. Assuming that the same rule would be applied in this state it does not

follow that such rule should be so extended as to be made applicable in the instant case.

There is a wide difference between a publication respecting a matter of purely local concern which is mainly circulated outside the interested area and to people having no interest therein, and one involving a matter of public policy or economic theory which, while arising in a local community, is directly connected with and may vitally affect the habits, modes of living and economic views of people throughout the nation. There is a marked distinction between the making of such a purely local attack and a comment upon political views and policies the effect of which cannot, from their very nature, be confined to any locality. There was evidence here that the respondents were interested in the educational systems of the nation and the various states, and in the opinions and theories used in connection with the education and training of our young people and that some of the readers of the Post were also interested in such matters. ■ We may take judicial notice of the fact that the overwhelming majority of the citizens of this country are interested in such matters and in questions which affect the education and proper training of our youth. ■ Regardless of individual views thereon, the question of whether or not thrift should be taught or encouraged in the schools is one of practically universal interest and not a local matter of interest only to the inhabitants of any particular community. If the matter of whether or not one is a Communist is material here it is equally a matter of general rather than purely local interest. Without further discussion, we hold that this publication was a communication between interested persons within the meaning of the statute.

The appellant next contends that actual or express malice appears because the evidence discloses a lack of probable cause for believing the statements contained in the publication to be true, and because a similar statement was republished in the January 20, 1940, issue of the Post. ■ It is argued that lack of probable cause is shown by evidence that the Bank of America, in reply to a letter of inquiry from the editor of the Post, requested that the matter be dropped; that the reporter sent by the Post to investigate the matter, interviewed but five people; that this reporter wrote and sent in the article just as it was published except that the last sentence thereof consisted of a statement from an official of the Bank of America as to their object in setting up school banks, and

that the editor of the Post eliminated that sentence and substituted the final sentence as it was published; and that when he sent the article in this reporter wrote a letter to the editor in which he suggested that on account of its trivial background they might not want to use the article, and further stated that "While the board members are 'radical' and 'liberal' . . . they are not Communists."

The things just mentioned are not sufficient to establish a lack of probable cause for believing that the statements published were true. ■ Moreover, there is evidence that no one connected with the defendants was personally acquainted with the appellant or had any ill will toward him or desire or intent to injure him; that the statements in question were honestly believed to be based upon information received from reliable sources, and were reasonably and honestly believed to be true; that no one connected with the publication had knowledge of any facts which would cause him to question the truth of the statements made in the article or the reliability of the sources of information; and that a very considerable investigation was made before the article was published.

With regard to the origin of the article and the investigation made, the evidence is as follows. In June, 1939, the editor of the Post received a letter from a lady in Laguna Beach referring to the absence of a savings plan in the schools of that city and stating that a letter from the school board had been made public in which a bank was requested to desist from all activities in that direction as "some of the board members were opposed to large corporations and they didn't believe in saving, either." The editor replied to the lady expressing interest, requesting a clipping or other information about the matter, and stating that it should be worth an editorial. On July 14, 1939, this lady replied, enclosing a clipping from a local newspaper. This clipping stated that a resident of Laguna Beach had written to the Bank of America asking why that city was the only city of its size on the south coast which did not have school savings, and then set forth what purported to be a copy of a part of a letter in reply written by that bank which contained the statement, after a reference to the fact that they had been asked to discontinue the savings system, "The reasons given me were that several of the school board members were 'opposed to large corporations and one was opposed to saving in any and

all forms'." On July 20, 1939, the editor of the Post wrote to the bank and after referring to the portion of the bank's letter appearing in this clipping, stated that before commenting on the matter editorially he would like to know whether the matter in the letter was an accurate statement of the attitude of a majority of the Board of Education. He also stated that he was writing to this appellant asking him the same question, and that while he could appreciate the bank's desire not to stir the matter up it was a matter which, if true, "demands national publicity." The bank replied that it did not wish to embarrass the board members, who were their neighbors and friends, "because their ideas and opinions were not wholly in accord with ours" and suggested that the matter be dropped. On July 20, 1939, the editor also wrote to this appellant calling his attention to the clipping he had received and stating that before commenting on the matter editorially they would be glad to have his statement as to whether his views and the views of the majority of the board had been accurately represented in the clipping. The appellant testified that he received this letter and that he never replied thereto. On August 23, 1939, the editor wrote to a reporter in San Francisco who had previously written for the Post and asked him to go to Laguna Beach and investigate this matter. On August 28, 1939, this reporter sent in the article as above described, which was accompanied by a letter which stated that in the article he had set out the uncontrovertible facts. The final paragraph of this letter stated that there were in Laguna Beach "400 or so communists— or in many cases so-called communists" and that "a few movie stars commute the 57 miles to Hollywood daily."

The evidence not only discloses a rather extensive investigation for the purpose of learning the truth of the statements which were later made concerning the appellant, but that evidence in its entirety discloses, without substantial conflict, that the respondents had probable cause for believing that the statements attributed to the appellant had been made by him. They were so informed directly and indirectly after a considerable effort to learn the truth, including a direct inquiry made to the appellant who refused to answer, although a denial on his part would in all probability have prevented the publication at least insofar as it concerned him.

It is further contended that actual malice appears because, so it is said, a similar statement was republished in

the January 20, 1940, issue of the Post. In that issue, under the heading "Children and Money," an article from the December issue of the Journal of the National Educational Association was reprinted with the following comment: "How the usual Students' Savings Bank System was barred from the schools of Laguna Beach, California, one ground being that 'kids should spend their money and let the Government take care of them when they are old' was described here recently." This appellant was not mentioned in that article and we agree with the observation of the trial court "if there was malice on the part of Mr. Stout, I am inclined to think he would not have overlooked the opportunity to have mentioned Mr. Harris by name in the January 20th article. Actually, he disregarded the name 'Harris' in that article and that is pretty good evidence to me that Mr. Harris as an individual did not mean very much to him." The article of January 20, 1940, is a further indication that respondents' sole interest was in the broad question of thrift in the schools and that any reference to individuals was merely incidental and without any feeling against or intent to injure or to reflect upon any certain person. In *Siemon* v. *Finkle,* 190 Cal. 611 [213 Pac. 954], the court said: "The malice referred to by this section of the Civil Code [Sec. 47, subd. 3] is malice in the popular conception of the term; that is to say, as a desire or disposition to injure another founded upon spite or ill will." In our opinion, the only reasonable inference which may be drawn from the evidence in its entirety is that the communication here in question was one made without malice to a person interested therein by one who was also interested. This being true, there was no question in that regard which should have been submitted to the jury.

Appellant's final contention is that the court erred in excluding evidence of the financial resources of the respondents, it being argued that such evidence was admissible on the issue of punitive or exemplary damages. Section 48a of the Civil Code provides that no more than actual damages shall be recovered in an action of this nature unless a retraction be demanded by serving a notice specifying the statements claimed to be libelous and requesting that the same be withdrawn, and unless such a retraction is not published in the manner provided after such a request for withdrawal is made. The appellant contends that a letter written by his counsel to the respondents was a substantial compli-

ance on his part with this section, and that no retraction or withdrawal having been published within the time allowed the evidence in question was admissible. On December 22, 1939, appellant's counsel wrote a letter to the respondents calling attention to the publication in question, stating that he was advised by the appellant that there was not a word of truth in the statement attributed to him in the article, that the appellant felt that the publication was particularly damaging to him because of his official position and responsibilities in the educational field, and then saying: "No mere retraction, therefore, for a statement of this kind could possibly atone for the outrage committed by such unwarranted publication. I am instructed by Mr. Harris to say that unless proper and substantial compensation is made by you, that he will appeal to the courts for satisfaction and vindication." This is the only demand or request made upon the respondents and it clearly appears that it contains no request for a retraction or that the published matter be withdrawn as provided for in the statute. On the other hand, it rather clearly appears from this letter that no retraction was desired and that nothing less than financial compensation would be accepted. No substantial compliance with the statute appears and the court's ruling was proper.

For the reasons given the judgment is affirmed.

Marks, J., and Griffin, J., concurred.