[Civ. No. 26435.   Second Dist., Div. One.   Dec. 19, 1962.]

JAMES C. CORMAN, Plaintiff and Appellant, v. C. LE-
MOINE BLANCHARD, Defendant and Respondent.

Robert S. Butts, Joseph Biafora, Harry Gross and Ronald H. Bonaparte for Plaintiff and Appellant.

Downey A. Grosenbaugh and George E. McGill for Defendant and Respondent.

LILLIE, J.—Plaintiff sued a rival candidate for Congress for alleged injury to his reputation assertedly caused by the publication of a campaign pamphlet misrepresenting his political views. General demurrer to the first amended complaint was sustained without leave to amend; plaintiff appeals from the judgment entered on the order.

The complaint in libel alleges that prior to the 1960 election defendant circulated among the voting public in the 22d Congressional District a four-page printed pamphlet published by the "22d District Independent Democratic Committee" (incorporated by reference and pleaded in paragraph VI, and attached thereto as Exhibit A). On the first page of the pamphlet the word "Remember" appears in large letters and below it, "No candidate for office on the Democratic ticket is endorsed by the C.D.C. unless he subscribes to its platform!" The inside page reads as follows: "Is this the kind of program *you* want for our state and nation? Do you favor?

1. Abolition of the Un-American Activities Committee.  Yes  No
2. Inclusion of Red China in the Geneva negotiations on control of neculear [*sic*] tests.  Yes  No
3. Remodeling the United Nations into a world organization that can enact, interpret and enforce world law upon individuals and governments alike in disarmament matters.  Yes  No
4. Indefinite suspension of neculear [*sic*] weapons tests whether or not the other countries agree to a workable inspection system.  Yes  No
5. Abolition of all state and federal loyalty oaths, as well as those required for free scholarships under the National Defense Education Act.  Yes  No
6. Elimination of secret Congressional Committee hearings. (This would make top secret testimony available to the public.)  Yes  No
7. Favored review of treason conviction of atom spy Morton Sobel.  Yes  No"

Referring to the above and to the balance of the resolutions continuing on the next page, is the following:

"On February 12, 13 and 15, 1960, the California Democratic Council met in Fresno, in statewide convention. Governor Brown was the keynote speaker. At this time, some 2,300 C.D.C. delegates from 500 Democratic clubs approved resolutions advocating ⸻⟶ "

On page three appears seven more resolutions:

"8. Removing from the Postmaster General all powers to halt the distribution of pornographic materials through the United States mails.    Yes   No

9. Extending the right to organize to all public employees—firemen, police officers, etc. (This would incur the risk of a police or fireman strike.)    Yes   No

10. Repeal of the Landrum-Griffin Labor Reform Bill of 1959 which calls for unions to publish financial records and compels union officers to take loyalty oaths.    Yes   No

11. Eliminating the use of Mexican nationals and other aliens for farm work.    Yes   No

12. Increasing economic aid to underdeveloped nations, regardless of the character of their governments and reducing of military assistance abroad. (This could leave small nations prey to agressors or result to aid to Communist dominated countries.)    Yes   No

13. Establishing of local police review boards, separate from law enforcement agencies, to hear citizens complaints of mistreatment by police and recommend disciplinary action.    Yes   No

14. Legislation prohibiting the United States from deporting non-citizens for any reason, if they have been in this country 5 years or more. (This might hold true even though these aliens could constitute a threat to the security of our nation.)    Yes   No";

and the following:

"James C. Corman, candidate for Congress in the 22nd District, has been endorsed by the C.D.C. for election this year. No candidate for office on the Democratic ticket is endorsed by the C.D.C. unless he subscribes to its platform.

"As members of the 22nd District Independent Democratic Committee, we do not believe that this platform is in the best interests of America, our community, or our families. Candidates who support this platform should not be elected to represent us in Sacramento or Washington."

On the last page of the pamphlet are printed copies of three news clippings—two from the Valley Times, one quoting plaintiff: " 'I don't think we should cut taxes; I think we should raise them!' " and one carrying plaintiff's photograph;

a third from the Herald Express entitled, "Democrats' Statement," asserts:

"Many loyal Democrats in California must be dismayed by the astonishing statement of policy which emerged from the California Democratic Council convention in Fresno, and which must be assumed to be the key to Democratic Party campaigning for the big election in November.

"Probably the most astounding feature to many thousands of Californians is the policy of opposition declared in the statements to measures which for years have been regarded as strengthening the security and safety of Americans from the dangers of Communism."

In paragraphs VII and VIII of the complaint, plaintiff pleads matters of innuendo and inducement—that defendant worded the 14 resolutions so that they correspond with express political policies of organizations with Communist affiliations or sympathies, groups distributing pornographic materials, labor organizations under indictment for criminal and racketeering activities, and underworld organizations seeking to weaken law enforcement in California; and that defendant intended to assert that plaintiff supported these resolutions by declaring that—the same were approved by the C.D.C., plaintiff was endorsed by the C.D.C., and no Democratic candidate is endorsed by the C.D.C. unless he subscribes to its platform. He further alleges that defendant intended to assert, and was understood by readers of the pamphlet as asserting, that he (plaintiff) was either a Communist or a Communist sympathizer; in sympathy with and supported by groups distributing pornographic materials, labor organizations under indictment and underworld organizations seeking to weaken law enforcement; and opposes measures regarded as strengthening the security and safety of Americans from dangers of Communism. He pleads the publication to be false, unprivileged and defamatory; injury and damage to his character and occupation; and defendant's ill will and malice. Finally, the complaint alleges that defendant printed and distributed the pamphlet in violation of section 5005, Elections Code, in that it did not carry the name and address of the printer and the chairman and secretary or two officers of the political or other organization issuing it, nor the name and address of any voter responsible for it.

Inasmuch as this case arises on demurrer, we assume the sufficiency of the complaint alleging the falsity of the statements published, and defendant's intent. (*Howard* v.

*Southern Cal. Associated Newspapers,* 95 Cal.App.2d 580 [213 P.2d 399].) Thus, for our purpose, defendant wilfully and maliciously represented that plaintiff favored certain political views to which he does not subscribe. Moreover, for our consideration, we borrow the contention of plaintiff and the lower court's ruling thereon, and assume that because of the violation of section 5005, section 5005.5, Elections Code, precludes defendant from pleading any absolute or qualified privilege to print the publication; and that the publication was unprivileged. Thus, the sole issue before us is whether the complaint states a cause of action for libel.

Appellant argues first that per se the publication is libelous; then, as his second contention, assuming it is not libelous per se, that the pleaded matters of innuendo, inducement and special damage clearly point up the defamatory nature of the publication in that it informed the reader and by it he understood, that he (plaintiff) ''was either in sympathy with or a member of groups infiltrated by Communists, Communist sympathizers and/or criminals.'' (A.O.B., p. 6.) He cites numerous authorities involving defamation by implication— that plaintiff was a Communist or Communist sympathizer (*Herrmann* v. *Newark Morning Ledger Co.,* 48 N.J. Super. 420 [138 A.2d 61]; *MacLeod* v. *Tribune Pub. Co.,* 52 Cal.2d 536 [343 P.2d 36]; *Farr* v. *Bramblett,* 132 Cal.App.2d 36 [281 P.2d 372]; *Faulk* v. *Aware, Inc.,* 3 Misc.2d 833 [155 N.Y.S.2d 726]; *Foltz* v. *News Syndicate Co.,* 114 F.Supp. 599), or of association with criminals or criminal elements (*Schomberg* v. *Walker,* 132 Cal. 224 [64 P. 290]) or persons of ''low character.'' (*Ervin* v. *Record Pub. Co.,* 154 Cal. 79 [97 P. 21, 18 L.R.A. N.S. 622].) Appellant complains the lower court erred in failing to consider three factors:—''the statements which surround the 14 resolutions'' (A.O.B., p. 27), ''the intent of the defendant in publishing the pamphlet'' (A.O.B., p. 28), and ''the climate of public opinion'' (A.O.B., p. 30).

We deal first with appellant's contention that the pamphlet is libelous per se, that is, defamatory on its face without necessity for pleaded explanatory matter by way of inducement, innuendo or other extrinsic fact. (Civ. Code, § 45a.) To be libelous the publication, besides being false and unprivileged, must have exposed plaintiff to ''hatred, contempt, ridicule or obloquy,'' or caused him ''to be shunned or avoided,'' or have a tendency ''to injure him in his occupation.'' (Civ. Code, § 45.) In determining the issue of defamation the publication in question must be considered

in its entirety; "[i]t may not be divided into segments and each portion treated as a separate unit." (*Stevens* v. *Storke*, 191 Cal. 329, 334 [216 P. 371].) It must be read as a whole in order to understand its import and the effect which it was calculated to have on the reader (*Stevens* v. *Snow*, 191 Cal. 58 [214 P. 968]; *Harris* v. *Curtis Pub. Co.*, 49 Cal.App.2d 340 [121 P.2d 761]; *Howard* v. *Southern Cal. Associated Newspapers*, 95 Cal.App.2d 580 [213 P.2d 399]), and construed in the light of the whole scope and apparent object of the writer, considering not only the actual language used, but the sense and meaning which may have been fairly presumed to have been conveyed to those who read it. (*Noral* v. *Hearst Publications, Inc.*, 40 Cal.App.2d 348 [104 P.2d 860].)

■ If the publication so construed is not reasonably susceptible of a defamatory meaning and cannot be reasonably understood in the defamatory sense pleaded, the demurrer was properly sustained. (*Gallagher* v. *Chavalas*, 48 Cal.App.2d 52 [119 P.2d 408]; *MacLeod* v. *Tribune Publishing Co.*, 52 Cal.2d 536 [343 P.2d 36].)

■ The writing before us simply consists of a declaration of 14 stated political views on certain controversial public issues attributed to a candidate seeking election to public office; and critical comments on such views. Applying the rules hereinabove stated we conclude that the publication could convey no defamatory meaning to those to whom it was circulated, and that reasonably and fairly construed lacks any implication that plaintiff is disloyal to this country or a traitor, or a Communist or Communist sympathizer, or is affiliated or sympathetic with any labor organization under indictment, group distributing pornographic material or underworld organization.

An analysis of the political views attributed to plaintiff, set up in the publication as 14 "resolutions" approved and advocated by the C.D.C., reveals that each amounts to no more than a "point of policy" or opinion or theory of a current political issue of a national, international or local nature, presently controversial in the area of public affairs. While the principles, attitudes, policies and philosophies reflected in these points of view may be acceptable to some and wholly unacceptable to others, popular or unpopular, some or all of them have nevertheless been prevalent among many well-informed, law-abiding, loyal Americans — in fact the pamphlet specifically states that the resolutions were approved by 2,300 delegates from "500 Democratic Clubs." Thus,

these views are not entirely absent from the national and local scene — the Democratic Clubs mentioned consist of members of the Democratic Party, which party is of sufficient strength and popularity as to have elected the President of the United States and the Governor of California.

The balance of the publication consists of critical comments on the political views therein enumerated—the "statements which surround the 14 resolutions" which appellant asks us to consider. At the outset it should be noted that the publication levels no criticism against the plaintiff personally, nor is he charged with doing anything of an illegal, immoral, criminal or traitorous nature or with being a Communist or Communist sympathizer. The publication directs criticism solely against the political views attributed to him, which views had been approved by the C.D.C. However, in this connection the writer of the pamphlet only asks the reader: "Do you favor?" these resolutions, "Is this the kind of program *you* want for our state and nation?"; and, opines that such "platform" is not "in the best interests of America, our community, or our families." The publication further comments that it is reported in the press that "[m]any loyal Democrats in California must be dismayed" by the policies of this platform "which must be assumed to be the key to Democratic Party campaigning for the big election in November," and that "Probably the most astounding feature to many thousands of Californians is the policy of opposition declared in the statement [platform] to measures which for years have been regarded as strengthening the security and safety of Americans from the dangers of Communism." While citizens in all walks of life harboring various political philosophies, including those alien to the American way, may subscribe to some or all of the 14 "points of policy" attributed to plaintiff, the publication conveys to the reader no more than that the "resolutions" relate to current controversial matters that are criticized by some as not in the best interests of this country and are opposed by many Democrats in California, who consider themselves loyal to Democratic Party principles and who assume such a program will constitute the key to their party's election campaigning, as contrary to measures they and others have regarded as strengthening the security and safety of Americans from the dangers of Communism. Wherein are the stated resolutions or critical comments concerning them susceptible of a libelous construction? Indeed it is here not even a question of an innocent and harm-

less interpretation as against a libelous one, for the language used in the publication, as popularly and normally understood by the average reader (*Howard* v. *Southern Cal. Associated Newspapers*, 95 Cal.App.2d 580 [213 P.2d 399]; *Megarry* v. *Norton*, 137 Cal.App.2d 581 [290 P.2d 571]; *Dethlefsen* v. *Stull*, 86 Cal.App.2d 499 [195 P.2d 56]; *Bates* v. *Campbell*, 213 Cal. 438 [2 P.2d 383]; *Lorentz* v. *R. K. O. Radio Pictures*, 155 F.2d 84), fairly and reasonably construed, is not susceptible of a defamatory meaning. Although plaintiff's purported political views on such controversial matters of broad general policy and universal interest are attacked in the publication by some as not in our best interests and by "many" California Democrats as reported therein, there is no charge, or even any implication, that plaintiff is guilty of misconduct or acts of moral turpitude or activities of an illegal or criminal nature, or that he is disloyal or a traitor or a Communist or Communist sympathizer, or "in sympathy" with or a member of groups infiltrated by Communists, Communist sympathizers and/or criminals. And while the political and economic views attributed to plaintiff may, in a heated contest for political office, make him unpopular with certain members of the voting public in the 22d Congressional District and require him, in order to combat any unpopularity caused therefrom, to bring before the voters his true program, they are not of such a character that injury must be presumed from the language itself or that their attribution to plaintiff as a candidate is in itself and per se a holding of him up to hatred, contempt or ridicule or that which would presumably cause him to be shunned or avoided or have a natural tendency to injure him in his occupation.

The defamatory issue arising out of publications containing comment on public affairs has been consistently regarded with relation to freedom of the press. The courts' attitude is reflected in *Noral* v. *Hearst Publications, Inc.*, 40 Cal.App.2d 348 [104 P.2d 860]. Although the court therein held that the complaint alleging defendant's newspaper article, which reported a charge that citizens were taxed to finance Moscow propaganda by paying the relief bill for 31,000 members of the Workers' Alliance while its officials diverted their membership dues to further "Communist agitation under direct orders from the Third Internationale headquarters in Russia" (p. 350), failed to state a cause of action for libel inasmuch as the article did not defame any ascertainable person, it stated at page 353: "Charges of libel against a publication which

has reported or commented upon matters involving public policy should be viewed with caution. It is in such matters that the freedom of the press is of paramount concern. Without such freedom, the march of progress might be stayed or the venom of alien cultures might stealthily undermine cherished landmarks. 'It is far better for the public welfare that some occasional consequential injury to an individual, arising from general censure of his profession, his party, or his sect, should go without remedy, than that free discussion on the great questions of politics, or morals, or faith should be checked by the dread of embittered and boundless litigation.' (*Ryckman* v. *Delavan,* 25 Wend. (N.Y.) 186, 199.)'' This language was quoted in *Harris* v. *Curtis Pub. Co.,* 49 Cal. App.2d 340, 345 [121 P.2d 761], which, while not involving an election, presents a situation similar to the instant one, in that matters of public policy were criticized. Defendant published an article concerning the students' savings bank system in public schools commenting on the policies of the school board in Laguna Beach which had refused to permit the system in its schools. It quoted plaintiff, addressing the Rotary Club, as saying: ''Why should kids save, anyway? We are going to have old-age pensions, and kids should spend their money and let the Government take care of them when they are old.'' The article then continued, ''Laguna Beach includes several hundred Communists . . . .'' On the issue of whether the article was libelous per se the court said it was not, holding it to be proper comment on a matter of public policy. ''We are unable to hold that in commenting upon such a question of public policy the inclusion of a statement attributing to a public official economic views of a sort which were then held and accepted by a large part of our population is, in itself and *per se,* a holding of that person up to hatred, contempt or ridicule or that it would presumably cause him to be shunned or avoided, or that it necessarily must or presumably will have a natural tendency to injure him, and much less that it will presumably and as a proximate consequence cause him pecuniary loss.'' (P. 347.) And again at page 348: ''In *Snavely* v. *Booth,* 36 Del. 378 [176 A. 649], the court said: 'We have been referred to no authority, nor have we been able, in an extended search, to find authority, holding that criticism of mere opinion or theory is actionable defamation.' The statement in question not only related to a matter of public policy of general interest but it was not of such a character that injury must be presumed from the lan-

guage itself and without the necessity for explanation and specific application.

"With respect to the final sentence of the published article ['Laguna Beach includes several hundred Communists . . .'] it does not necessarily or presumably appear that it refers to this appellant. The article, as a whole, refers to the city of Laguna Beach as well as to its school system. It makes a general reference to the entire school board, and a specific reference to things allegedly said by the appellant and also by another member of that board, and follows this by another general statement. The fact that the concluding sentence is in such general terms is a further indication that the intent and purpose of the article was to criticize a point of view and policy being carried out in that community rather than to attack any individual. Not only is there no direct charge that the appellant is a Communist, whatever the precise meaning intended by that word which has very generally been loosely applied to persons of almost every conceivable point of view, but such a charge is not necessarily to be implied. If it could be so implied there would still be a question whether that alone is libelous per se. The necessity for pleading innuendoes where the charge is that a person has been accused of being a Communist seems to be recognized in *Gallagher* v. *Chavalas*, 48 Cal.App.2d 52 [119 P.2d 408], and in the cases cited. . . .

"The precise question here presented is new, which is not surprising since attacked publications are usually not alike nor even similar, and since there have been so few cases involving an attack upon political or economic opinions or theories, especially where they were not accompanied by charges of criminal or traitorous acts."

An election was involved in *Howard* v. *Southern Cal. Associated Newspapers*, 95 Cal.App.2d 580 [213 P.2d 399]. Defendant published a criticism of a movement initiating a recall election by calling it "illegitimate," "sinister," et cetera, and by referring to the committee sponsoring it as a "disgrace" and a "dangerous and unjust element." In holding the letter carrying the criticism to be not libelous per se, the court stated at page 584: "Publications by which it is sought to convey pertinent information to the public in matters of public interest are permitted wide latitude. In controversies of a political nature, in particular, the circumstances often relieve statements, which might otherwise be actionable, of possible defamatory imputations. Mere expres-

sions of opinion or severe criticism are not libelous if they clearly go only to the merits or demerits of a condition, cause or controversy which is under public scrutiny, even though they may adversely reflect upon the public activities or fitness for office of the individuals who are intimately connected with the principal object of the attack. (*Babcock* v. *McClatchy Newspapers, supra* [82 Cal.App.2d 528 (186 P.2d 737)]; *Eva* v. *Smith,* 89 Cal.App. 324 [264 P. 803]; *Taylor* v. *Lewis,* 132 Cal.App. 381 [22 P.2d 569]; *Harris* v. *Curtis Pub. Co.,* 49 Cal.App.2d 340 [121 P.2d 761]; *Wilson* v. *Stockholders Pub. Co., Inc.,* 4 Cal.2d 724 [52 P.2d 913].)

"These familiar rules have direct application to elections for the recall of public officials. (See *Maher* v. *Devlin,* 203 Cal. 270 [263 P. 812], recall of mayor and city council; *Taylor* v. *Lewis, supra,* recall of city councilman.)"

Although each case must be decided in reference to its own facts and surrounding circumstances (*Harris* v. *Curtis Pub. Co.,* 49 Cal.App.2d 340 [121 P.2d 761]) (and we have considered not only the resolutions themselves but the statements surrounding them, the intent of the defendant and the climate of public opinion), like the situations in the above cited cases, no criminal or traitorous charges or charges of misconduct were made against plaintiff; to the contrary, comment was made on, and criticism was directed solely to, plaintiff's political views on matters of current public interest. The merits of plaintiff's so-called "program," referred to in the publication as one approved by the C.D.C., were by the publication held up to public scrutiny as might well have been expected inasmuch as plaintiff had placed his candidacy for election to Congress before the voters of the 22d Congressional District. True the attribution of this "program" to plaintiff, because of its controversial nature, may have adversely reflected upon his acceptability for public office in the minds of some of the voting public as being a candidate holding political and economic views contrary to their own, but beyond that the entire situation is lacking in the imputation necessary to constitute the publication defamatory.

Nor is the language of the publication reasonably construed, susceptible of a defamatory meaning by the innuendo and inducement pleaded in the complaint; even considering the extrinsic facts, a clear and definite libelous imputation simply does not therein exist. By innuendo and inducement plaintiff alleged that the publication was intended to convey the charge that he was either a Communist or a Communist sympathizer

138

and in sympathy with or supported by groups distributing pornographic materials, labor organizations under indictment, and underworld organizations. (Pars. VII, VIII.)

■ "The office of an innuendo is to declare what the words meant to those to whom they were published. When the words themselves, under any circumstances, would convey to those who read or hear them a meaning within the statutory definitions, there is no occasion for the pleading of an innuendo. Conversely, if the words under no circumstances could convey a defamatory meaning, then no innuendo can make them defamatory. An innuendo, however, is necessary where the words used are susceptible of either a defamatory or an innocent interpretation. (*Bates* v. *Campbell, supra,* p. 442; and see Hall, *Pleading in Libel Actions,* 12 So.Cal.L.Rev. 224, 229-231; *Washer* v. *Bank of America,* 21 Cal.2d 822, 828 [136 P.2d 297, 155 A.L.R. 1338].)

We have already concluded that the language used in the publication is not susceptible of a libelous interpretation and that considered in its entirety it is lacking in any language, considered in its ordinary and common usage, which in normal understanding of the average reader could be considered as defamatory. (*Sullivan* v. *Warner Bros. Theatres, Inc.,* 42 Cal.App.2d 660 [109 P.2d 760]; *Western Broadcast Co.* v. *Times-Mirror Co.,* 14 Cal.App.2d 120 [57 P.2d 977]; *Howard* v. *Southern Cal. Associated Newspapers,* 95 Cal.App.2d 580 [213 P.2d 399]; *Bates* v. *Campbell,* 213 Cal. 438 [2 P.2d 383].)

■ Where the language or words used in the publication can bear but one meaning and that is not defamatory, no innuendo can make the words libelous. (*Washer* v. *Bank of America,* 21 Cal.2d 822 [136 P.2d 297, 155 A.L.R. 1338]; *Pollock* v. *Evening Herald Pub. Co.,* 28 Cal.App. 786 [154 P. 30]; *Des Granges* v. *Crail,* 27 Cal.App. 313 [149 P. 777].) ■ It is the rule that plaintiff may not, by way of pleading extrinsic facts, enlarge or change the plain and ordinary meaning of the language used in the publication which is reasonably susceptible of only an innocent interpretation as to state a cause of action for libel. The innuendo may only interpret its meaning but cannot introduce one other or broader than the language naturally bears; it cannot add to or enlarge or change the sense of the published words. (*Grand* v. *Dreyfus,* 122 Cal. 58 [54 P. 389]; *Emde* v. *San Joaquin County Central Labor Council,* 23 Cal.2d 146 [143 P.2d 20, 150 A.L.R. 916].)

■ We are of the opinion that the lower court did not err in concluding that the publication alleged was not defama-

tory in character and holding that the complaint did not state a cause of action.

For the foreging reasons the judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

A petition for a rehearing was denied January 18, 1963, and appellant's petition for a hearing by the Supreme Court was denied February 13, 1963. Peters, J., was of the opinion that the petition should be granted.