[Civ. No. 35021. Second Dist., Div. Two. Dec. 15, 1970.]

SAMUEL W. YORTY, Plaintiff and Appellant, v.
OTIS CHANDLER et al., Defendants and Respondents.

## Counsel

Phill Silver for Plaintiff and Appellant.

Robert C. Lobdell, Gibson, Dunn & Crutcher, Robert S. Warren and Gary D. Stabile for Defendants and Respondents.

A. L. Wirin, Fred Okrand and Laurence R. Sperber as Amici Curiae on behalf of Defendants and Respondents.

## Opinion

**FLEMING, J.**—Libel action for $2,000,000 by Samuel W. Yorty against Otis Chandler, Los Angeles Times, The Times-Mirror Company (sued as Times Mirror Corporation), and Paul Conrad, in which plaintiff complains of a cartoon drawn by Conrad and published on the editorial page of the Los Angeles Times. The trial court ruled on demurrer that the cartoon was not defamatory and entered judgment for defendants.

The cartoon was published under the following circumstances: in mid-November 1968 Richard M. Nixon, having been elected President of the United States, was engaged in the selection of nominees for appointment to his cabinet. At a press conference Samuel W. Yorty, Mayor of the City of Los Angeles, publicly expressed interest in such an appointment, and, in particular, appointment as Secretary of Defense. According to the allegations of plaintiff's complaint, President-elect Nixon was then considering Mayor Yorty for appointment to a cabinet post, and that fact was known to defendants.

On 19 November 1968 the Los Angeles Times published on its editorial page the following cartoon and caption:

"I've got to go now . . . I've been appointed Secretary of Defense
and the Secret Service men are here!"

The cartoon depicts Mayor Yorty seated at his office desk talking on the telephone. Four white-coated medical orderlies with doleful expressions on their faces stand beside the desk. One orderly is holding a straight jacket behind his back while another beckons to Mayor Yorty with his finger. The caption reads, "I've got to go now . . . I've been appointed Secretary of Defense and the Secret Service men are here!"

In claiming that the cartoon was defamatory, the complaint asserts:

"In publishing said cartoon, Defendants and each of them, intended to mean and convey to the readers of the editorial page of the Los Angeles Times, that Plaintiff was claiming that he had been appointed Secretary of Defense by President-elect Richard Nixon, and that he was further claiming that he was qualified to serve in such capacity; and that in making such a claim, he was insane and should be placed in a straight jacket. The defendants, in publishing said cartoon, intended to insinuate to [their] readers that plaintiff was unfit to serve as Secretary of Defense and, that in believing he was so qualified, he was mentally ill." Plaintiff thus interprets the cartoon as a factual report that Mayor Yorty suffered from the delusion that he had been appointed Secretary of Defense and that because of his delusion he was insane and needed to be placed in a straight jacket.

The sole question is whether the cartoon is reasonably susceptible to the interpretation placed upon it in plaintiff's complaint. The trial court concluded it was not, ruled as a matter of law that the cartoon was not libelous, and dismissed the complaint. Plaintiff appeals.

First, some consideration of the subject matter of this suit, the political cartoon. Ever since stone-age man began to draw on the walls of his cave, caricature has been used as a device to express opinion on matters of current interest. Examples of the art of caricature in ancient Egyptian and Roman times still abound. With the advent of printing, caricature became a form of social and political commentary, and in one of its aspects began to manifest itself as critical opinion on public issues and public figures. Thus the political cartoon was born. In America the first political cartoon was designed by Benjamin Franklin, and by the time of the Civil War the political cartoon had become a standard adjunct to public life. In the 1870's Thomas Nast proved the effectiveness of the political cartoon by a devastating series of drawings which helped break the corrupt political regime of "Boss" Tweed and the Tammany Ring. From Daumier and Tenniel to Low and Herblock the political cartoon has occupied a central position in the presentation of critical comment on events and personages of the times.

The genius of a well-conceived political cartoon lies in its ability to communicate in graphic form a statement of editorial opinion which might other-

wise require paragraphs of written material to express. To say so much with so little, the political cartoonist makes extensive use of symbolism, caricature, exaggeration, extravagance, fancy, and make-believe. For example, if a federal official made a "fact-finding" trip to a vacation spot at public expense, a political cartoonist might criticize that official's conduct by drawing a distorted likeness of the official taking money from the pocket of an unwary Uncle Sam. Because the use of symbolism in political cartooning is well-understood, the drawing would be interpreted by its viewers as editorial comment on the waste of public funds involved in the trip, and no reasonable viewer would consider it a factual report that the official had picked someone's pocket, much less that of an elderly gentleman with a wispy white beard who was dressed in an American flag.

A cartoon, of course, remains subject to the law of libel (Civ. Code, § 45), and, like any other form of depiction or representation, it may be found libelous if it maliciously presents as fact defamatory material which is false. For example, a political cartoon which falsely depicts a public official selling franchises for personal gain, or a judge taking a bribe, or an attorney altering a public record, or a police officer shooting a defenseless prisoner, will not be exempt from redress under the laws of libel merely because the charge is depicted graphically in linear form rather than verbally in written statement. (*Snively* v. *Record Publishing Co.,* 185 Cal. 565 [198 P. 1]; *Newby* v. *Times-Mirror Co.,* 173 Cal. 387 [160 P. 233]; *Gloria* v. *A Colonia Portuguesa,* 128 Cal.App. 640 [18 P.2d 87].) On the other hand, a cartoon which depicts a fanciful, allegorical, anthropomorphical, or zoomorphical scene will not be considered libelous merely because it depicts a public person as a flower, a block of wood, a fallen angel, or an animal. Because a political cartoon presents critical opinion in imaginative and symbolic form, in claimed instances of defamation a court must ferret out the underlying themes of the cartoon and then determine whether these can reasonably be considered libelous. (*Blake* v. *Hearst Publications Incorporated,* 75 Cal. App.2d 6 [170 P.2d 100].)

The present cartoon is said by plaintiff to have made two basic assertions: First, an assertion that the mayor was unqualified for high national office. Second, an assertion that the mayor, in believing he was qualified for high national office, demonstrated mental incompetency to such a degree that he required the restraint of a straight jacket. Defendants concede the first assertion and defend their right to make it. Defendants deny the second assertion and deny that any reasonable viewer would interpret the cartoon as having made such a statement.

On the first point, it is settled law that mere expression of opinion or severe criticism is not libelous, even though it adversely reflects on the

fitness of an individual for public office. (*Howard* v. *Southern Cal. etc. Newspapers,* 95 Cal.App.2d 580 [213 P.2d 399].) Here, the cartoon was published on the editorial page of the Los Angeles Times at a time President-elect Nixon was engaged in choosing nominees for his cabinet and after Mayor Yorty had publicly expressed interest in appointment as Secretary of Defense. The cartoon was a form of editorial comment on these events and pointedly expressed the opinion of the Los Angeles Times that the Mayor's view of his own political stature was so far removed from reality, that his reach for national office so exceeded his grasp, that his aspirations for political preferment so outran his qualifications, that these ambitions could popularly be described as insane, mad, or crazy. ■ To recognize the right of the Los Angeles Times to publish an unflattering and derogatory opinion of the mayor's qualifications for high national office at a time he was under consideration for such an appointment is not to accept that opinion as gospel writ, but merely to hold that in a free country the Los Angeles Times, like everyone else, has a right to express its views on who should be appointed to public office, even though its views are those of a political adversary and are presented in rhetorical hyperbole. (Cal. Const., art. I, § 9; *Eva* v. *Smith,* 89 Cal.App. 324 [264 P. 803]; *Taylor* v. *Lewis,* 132 Cal.App. 381 [22 P.2d 569]; *Corman* v. *Blanchard,* 211 Cal.App.2d 126 [27 Cal. Rptr. 327]; *Howard* v. *Southern Cal. etc. Newspapers,* 95 Cal.App.2d 580 [213 P.2d 399].) On this point we find pertinent the comments of the court in *Eva* v. *Smith, supra* (pp. 328-330): "It is claimed that . . . the article was published to disparage plaintiff, its plain import being to characterize him as the type of man who should not be returned to public office. Taking the article as a whole . . . it amounts to no more than a criticism of plaintiff's qualifications for office and one which defendant was entitled to make. . . . An individual who seeks or accepts public office invites and challenges public criticism so far as it may relate to his fitness and qualifications . . . The right of criticism rests upon public policy and those who seek office should not be supersensitive or too thin-skinned concerning criticism of their qualifications . . . . In so far as the articles might imply that in the opinion of defendant, plaintiff was unfitted for the office he was seeking to be returned to, no complaint can be made, for defendant had the right to express his opinion in this respect."

■ On the second point, plaintiff contends that the Los Angeles Times, in expressing its views on Mayor Yorty's fitness for a cabinet post, published a false report that he was in fact insane and needed the physical restraint of a straight jacket. If in fact defendants had published such a report unquestionably the publication could be found libelous. For example, in *Goldwater* v. *Ginzburg* (S.D.N.Y. 1966) 261 F.Supp. 784, affirmed (2d Cir. 1969) 414 F.2d 324, cert. denied 396 U.S. 1049 [24 L.Ed.2d 695, 90 S.Ct. 701], a

publication reported that Senator Goldwater was "mentally unbalanced," a "dangerous lunatic," a "coward," a "compensated schizophrenic," and charged that he suffered from "nervous breakdowns," "paranoia," "chronic psychosis," etc. These statements were considered by the court to involve more than subjective opinion and were ruled libelous, subject to proof of their falsity and proof of knowing or reckless disregard for the truth by the publisher. (See also cases cited in 23 A.L.R.3d 652.) At bench, however, what defendants published was not a factual report of news intended to circulate at face value but a cartoon intended to present an editorial comment on the mayor's qualifications for high national office. From the cartoon no reasonable person would assume more than that in the opinion of the Los Angeles Times the mayor was not qualified for the post of Secretary of Defense, President-elect Nixon would not appoint him, and it was foolish of the mayor to aspire to an appointment for which he was not qualified. No reasonable person would interpret the cartoon as a report that Mayor Yorty had actually made the statement shown in the caption or that he was in fact mentally deranged or insane. Clearly, the cartoon was using the surface imagery and stage properties of mental incompetency to express the underlying idea of unrealistic aspirations and extravagant hopes. In that respect its symbolism was not new to political cartooning. For example, a Currier and Ives lithograph published during the election of 1860 depicts utopian supporters of Abraham Lincoln marching with him to the "Lunatic Asylum" and carries the caption "The Republican Party going to the Right House." (Hess & Kaplan, The Ungentlemanly Art, a History of American Political Cartoons (1968) p. 75.)

The popular usage of words denoting mental incompetency, such as *insane, mad,* or *crazy,* to express the idea of excessive optimism, extravagant expectation, overweening ambition, foolish hope, distraction with eager desire, goes back in the English language to the time of Milton and Shakespeare.[1] Clearly, it was the latter idea which the cartoon intended to and did

---

[1]MAD: Webster's New International Dictionary, Second Edition, defines "mad" both as "exhibiting unsoundness or disorder of the mind," and as "foolish, vain, especially, rashly or ruinously foolish." The Oxford English Dictionary says: "1. Suffering from mental disease," and "2. Foolish; unwise." Shakespeare used the word in both senses in 1602.

Hamlet, Act V, scene 1, 165-170:
Hamlet:  Ay, marry, why was he sent into England?
Clown.  Why, because he was mad; he shall recover his wits there; or,
    if he do not, 'tis no great matter there.
Hamlet:  Why?
Clown:  'Twill not be seen in him there;
    there the men are as mad as he.

CRAZY: Webster's New International Dictionary, Second Edition, gives three current definitions: "Full of cracks or flaws," "insane," and "distracted with eager desire, excitement, or the like; inordinately desirous or obsessed." The Oxford English Dic-

convey. In *Correia* v. *Santos,* 191 Cal.App.2d 844 [13 Cal.Rptr. 132], one radio broadcaster charged another with being driven by "vanity of power" to "insanity." The court declared that "When these statements are considered as a part of the whole broadcast and are given the meaning which would be attributed to them by the average listener, it is apparent that the object of the broadcaster was not to describe the plaintiff as a person who was mentally ill but as one who was unreasonable in his actions and demands." (191 Cal.App.2d at p. 853.) In *Cowan* v. *Time, Inc.,* 41 Misc.2d 198 [245 N.Y.S.2d 723], an article entitled "Some Idiots Afloat" showed a photograph of plaintiff and others in an overloaded boat. The court concluded that in the context of the article the word "idiot" only charged plaintiff with carelessness in boating.

Plaintiff, however, while conceding that the cartoon might be interpreted as charging him with no more than foolish and unrealistic expectations, argues that the cartoon is also susceptible to a literal interpretation which charges him with mental disorder, and he contends that since the cartoon is susceptible of two interpretations—one innocent, one defamatory —it is for a jury and not a court to make the choice between conflicting interpretations (*Mellen* v. *Times-Mirror Co.,* 167 Cal. 587, 593 [140 P. 277]; *MacLeod* v. *Tribune Publishing Co.,* 52 Cal.2d 536, 546 [343 P.2d 36]). Hence, he argues, the trial court usurped the fact-finding function of a jury when it held the cartoon non-libelous as a matter of law. In debatable instances of libel the correctness of this view is not open to question. But here, there can be only one reasonable interpretation of the cartoon, and that interpretation is non-libelous. In such circumstances a court is required to rule as a matter of law that the material is not defamatory, and it is not allowed to submit the issue to a jury. This has always been the rule in California (*Mellen* v. *Times-Mirror Co.,* 167 Cal. 587, 593 [140 P. 277]; *Arno* v. *Stewart,* 245 Cal.App.2d 955, 959 [54 Cal.Rptr. 392]; *Corman* v. *Blanchard,* 211 Cal.App.2d 126, 132 [27 Cal.Rptr. 327]; *Howard* v. *Southern Cal. etc. Newspapers,* 95 Cal.App.2d 580, 586 [213 P.2d 399]; *Harris* v. *Curtis Publishing Co.,* 49 Cal.App.2d 340, 346 [121 P.2d 761]; *Eva* v. *Smith,* 89 Cal.App. 324 [264 P. 803]), and in recent years it

---

tionary says "crazy" is often "used by way of exaggeration in sense: Distracted or 'mad' with excitement, vehement desire, perplexity." In 1617 Chamberlain wrote of a man "noted to be crazy and distempered." And in 1641 Milton wrote of "the floting carcas of a crasie and diseased Monarchy."

Isane: Webster's New International Dictionary, Second Edition, defines "insane" to mean not only "exhibiting unsoundness or disorder of the mind," but also as "characterized by . . . the utmost folly; chimerical; unpractical; as an *insane* plan, attempt, etc." The Oxford English Dictionary defines "insanity" both as "unsoundness of the mind" and as "Extreme folly or want of sound sense." Thus in 1862 Spencer wrote of the "insanities of idealism," and in 1869 Coleridge wrote of an "insane and excessive passion for athletics."

has also become part of the guaranty of free speech under the First and Fourteenth Amendments to the federal Constitution (*Greenbelt Publishing Assn.* v. *Bresler,* 398 U.S. 6 [26 L.Ed.2d 6, 90 S.Ct. 1537]; *New York Times* v. *Sullivan,* 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412]).

In *Greenbelt Publishing Assn.* v. *Bresler, supra,* plaintiff Bresler was seeking to obtain from the City Council of Greenbelt a zoning variance on land owned by him, and at the same time the city was seeking to buy a different tract of land from him on which to construct a new high school. Bresler refused to agree to sell the high school property unless he were given a zoning variance on his other land, and at a city council meeting he was charged by persons from the community with "blackmail." Defendant, a weekly newspaper, reported these charges. In reversing a jury verdict for plaintiff and holding as a matter of constitutional law that the references to "blackmail" were not defamatory, the Supreme Court said: "For the reasons that follow, we hold that the imposition of liability on such a basis was constitutionally impermissible—that as a matter of constitutional law, the word 'blackmail' in these circumstances was not slander when spoken, and not libel when reported in the Greenbelt News Review. . . . It is simply impossible to believe that a reader who reached the word 'blackmail' in either article would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meeting or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense. On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable. . . . To permit the infliction of financial liability upon the petitioners for publishing these two news articles would subvert the most fundamental meaning of a free press, protected by the First and Fourteenth Amendments." (*Greenbelt Publishing Assn.* v. *Bresler,* 398 U.S. at pp. 13-14 [26 L.Ed.2d at pp. 14-15].)

These comments in *Bresler* have a parallel application to the cause at bench, and we paraphrase them thus: It is simply impossible to believe that a viewer of the cartoon would not have understood exactly what was meant: it was Mayor Yorty's public aspiration for appointment as Secretary of Defense which was being ridiculed. No reader could have thought that either the cartoonist or the editor of the Los Angeles Times was charging Mayor Yorty with mental derangement or mental incompetency. On the contrary, even the most careless reader must have perceived that the cartoon was no more than rhetorical hyperbole, a vigorous expression of opinion

by those who considered Mayor Yorty's aspiration for high national office preposterous. To penalize defendants for publishing this political cartoon would subvert the most fundamental meaning of a free press, protected by the First and Fourteenth Amendments.

We conclude that under both state and federal law the trial court correctly determined that the cartoon was not reasonably susceptible to a defamatory meaning and that consequently plaintiff had failed to state a cause of action.

The judgment of dismissal is affirmed.

Roth, P. J., concurred.

**COMPTON, J.**—I concur in the result reached by Justice Fleming in his very scholarly and learned analysis of the subject matter at hand, but for somewhat different reasons.

Because of what appears to me to be a continuing escalation in the frequency and viciousness of both physical and verbal attacks on duly elected public officials, I feel compelled to add some comments of my own.

The Los Angeles Times' right to express, in cartoon form, its opinion concerning the mayor's qualifications for public office is protected by the First Amendment to the United States Constitution. On the other hand, as Justice Fleming points out, the political cartoon is not protected if it is libelous and maliciously presents false and defamatory material. In other words, a cartoonist or an artist who undertakes, in pictorial form, to criticize an individual must be held to the same standards as though he used the printed word.

I am persuaded also that in determining whether or not a matter is defamatory, the fact that it is presented as a subjective opinion rather than a statement of fact is not completely controlling.

This is especially true where, as here, the issue is the imputation of mental illness. As a practical matter the question of an individual's sanity under the present state of the art is always determined on the basis of opinion—whether it be the opinion of a psychiatrist or the opinion of a layman, as those opinions are accepted under our rules of evidence.

As Justice Fleming so clearly points out, if the defendants in this case had published a false report that the mayor was in fact insane and needed the physical restraint of a straight jacket, such a report could be found libelous. (See *Goldwater* v. *Ginzburg* (S.D.N.Y. 1966) 261 F.Supp. 784, affd. (2d Cir. 1969) 414 F.2d 324, cert. den. 396 U.S. 1049 [24 L.Ed.2d

695, 90 S.Ct. 701].) In this area I see no distinction between a so-called statement of fact and an expression of opinion.

The question presented on this appeal is whether the cartoon in question is susceptible of a defamatory interpretation, i.e., and imputation of mental illness in the real sense. If the cartoon is so susceptible, it is defamatory whether it is viewed in terms of the Times saying "The Mayor is insane" or "In our opinion the Mayor is insane."

It is one thing for the Los Angeles Times to express an opinion that the mayor because of a lack of administrative ability, a lack of experience or qualification, or for a myriad of other reasons, was not a qualified candidate for political office, but it is quite another thing to falsely opine that his lack of fitness for political office was premised on mental imbalance.

Our affirmance of the trial court's decision deprives the plaintiff of an opportunity to have that question decided by a jury. For that reason we should be very careful about reaching the conclusion that "no reasonable viewer" could assume that the matter was defamatory.

Standing alone, the cartoon *is* susceptible of a defamatory meaning. Straight jackets and men in white coats are commonly associated in the popular mind with violent insanity. It is possible for a "reasonable viewer" to equate what was depicted in this cartoon with the type of words which were condemned in *Goldwater* v. *Ginzburg.*

In my view the cartoon in question is cured of any possible defamatory interpretation *only* when viewed in light of the retraction, by which the Times specifically disavowed any imputation of actual mental incompetency.

My concurrence in affirming the judgment is premised on the fact that the retraction sufficiently dispells the defamatory nature of the cartoon and that the plaintiff did not plead any special damages.

Justice Fleming points to a Currier and Ives lithograph of 1860 depicting President Lincoln on his way to an insane asylum as some precedent for reading out of the present cartoon any defamatory interpretation. Apparently that lithograph was never challenged. The fact that one libel goes unchallenged does not provide a sound basis for exculpating a second or similar libel.

Additionally, I discern a trend in the laws of libel comparable to the very frightening developments which we have witnessed in the obscenity field. Our courts have continued to pay lip service to the principle that obscenity does not enjoy First Amendment protection. At the same time, however, individual decisions holding matters not to be obscene have so raised the

threshold of what *is* obscene that the original principle has become a hollow shell.

Similarly, reiterating the principle that libel does not enjoy First Amendment protection while at the same time sanctioning progressively vicious and scurrilous false attacks upon public officials will render the laws of defamation meaningless.

The protection of the freedom of a responsible press does not require that we insulate from liability for libel the artists whose pens drip venom and whose skill in drawing and cartooning far exceeds their sense of responsibility, respect for the truth and the depth of their understanding of public issues.

In my opinion the defendants in this action escaped possible liability only because of a prompt and adequate retraction.

Appellant's petition for a hearing by the Supreme Court was denied February 10, 1971.